UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,          CRIMINAL ACTION

                    Plaintiff          Docket No: 2:18-cr-107-JAW


          -versus-


TIMOTHY ORTIZ,

               Defendant
_____

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on for
**Sentencing** held before **THE HONORABLE JOHN A. WOODCOCK, JR.,**
United States District Judge, in the United States District
Court, Edward T. Gignoux Courthouse, 156 Federal Street,
Portland, Maine on the 29th day of August, 2019 at 1:00 p.m.
as follows:


Appearances:

For the Government:  Darcie McElwee, Esquire
                     Assistant United States Attorney

For the Defendant:  Luke Rioux, Esquire




                    Dennis R. Ford
                 Official Court Reporter


                 (Prepared from manual stenography
                  and computer-aided transcription)

```
 1                    (Open court.  Defendant present.)

 2              THE COURT:  All right.  We are here in the matter of

 3   United States versus Timothy Ortiz, which is 2:18-cr-107-JAW.

 4   Would counsel please enter their appearances.

 5              MS. MCELWEE:  Good afternoon, Your Honor.  Darcie

 6   McElwee, Assistant United States Attorney for the United

 7   States.

 8              THE COURT:  Good afternoon.

 9              MR. RIOUX:  Your Honor, Luke Rioux, attorney for Mr.

10   Ortiz.

11              THE COURT:  Good afternoon.  So pursuant to our

12   discussion yesterday, I notice that the Government has filed

13   an information slightly altering the contents of the

14   indictment, and has also filed a revised prosecution version

15   on the same date, and it's my understanding that Mr. Ortiz is

16   prepared accordingly to waive his right to indictment by a

17   grand jury on that charge and to plead guilty to the newly

18   filed information; is that correct?

19              MR. RIOUX:  That is, Your Honor.  We have a waiver

20   of indictment here.  We've reviewed together the new

21   information.  We also reviewed the prosecution version and

22   we've discussed -- about it, the significant changes that have

23   been made and we are prepared to waive the grand jury and

24   plead to the information.

25              THE COURT:  All right.  Let's proceed with that
```

1    first and assuming that goes through, we will turn then to the

2    question of sentencing.

3        Mr. Ortiz, would you state your name?

4        THE DEFENDANT:  Timothy Ortiz.

5        THE COURT:  Mr. Ortiz, the purpose of this part of

6    the hearing this afternoon is for me to make sure you

7    understand what you're doing and that you're doing what you're

8    doing of your own free will.  In other words, what you do must

9    be both knowing and voluntary; do you understand?

10        THE DEFENDANT:  Yes.

11        THE COURT:  I'm going to start by asking you some

12    questions because I want to be sure you're competent.

13        How old are you, Mr. Ortiz?

14        THE DEFENDANT:  25.

15        THE COURT:  How far did you go in school?

16        THE DEFENDANT:  10th grade.

17        THE COURT:  Are you now or have you recently been

18    under the care of a physician or psychiatrist?

19        THE DEFENDANT:  No.

20        THE COURT:  Are you currently taking any medicine?

21        THE DEFENDANT:  No.

22        THE COURT:  Have you failed to take any medicine a

23    doctor told you you should take?

24        THE DEFENDANT:  No.

25        THE COURT:  Have you used any drugs or alcohol in

1    the last 24 hours?

2              THE DEFENDANT:  No.

3              THE COURT:  Do you believe you understand what's

4    happening in these proceedings?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Has your attorney explained to you the

7    consequences that may flow from these proceedings?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Mr. Rioux, have you had an opportunity

10   to speak to your client today?

11             MR. RIOUX:  Yes, I have.

12             THE COURT:  Do you have any concerns about his

13   competence?

14             MR. RIOUX:  No.

15             THE COURT:  Based on your lawyer's responses, your

16   responses and my direct observations, Mr. Ortiz, I do find you

17   are competent.

18        Have you been provided with a copy of the proposed

19   information setting forth the charge that the Government is

20   bringing against you?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Do you understand the charge being made

23   against you?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Have you consulted with Mr. Rioux about

1    these charges and has he explained them to you?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Mr. Rioux, are you satisfied that your

4    client understands the nature and the significance of the

5    charge made against him in the proposed information?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  And do you approve of your client's

8    waiver of indictment?

9              MR. RIOUX:  I do.

10             THE COURT:  Mr. Ortiz, the new information that was

11   filed on August 28, 2019, just yesterday, alleges as follows:

12   That you are guilty of a crime called possession of a firearm

13   by a felon.

14        It alleges that on or about September 25-26, 2016 in the

15   District of Maine, which means the state of Maine, you, also

16   known as Tyson, having been convicted of the following crimes

17   punishable by a term of imprisonment exceeding one year,

18   specifically aggravated sex trafficking, Class B, and unlawful

19   furnishing drugs, Class C, in Cumberland County Unified Court

20   in Portland, Maine, in docket number CUMCD-2015-05203,

21   judgment having been entered on February 5, 2016, knowingly

22   possessed in and affecting commerce a firearm, specifically a

23   Ruger new model Blackhawk .357 revolver bearing serial number

24   36-98896.

25        It also alleges that at the time the defendant possessed

1   the firearms, he knew that he had been previously convicted of

2   a crime punishable by imprisonment for more than one year and

3   therefore violated federal criminal law.

4       Do you understand the charge set forth in the

5   information that has been filed yesterday by the Government?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Do you understand that the charge made

8   against you in the information is a felony offense?

9           THE DEFENDANT:  Yes.

10           THE COURT:  You have a constitutional right to

11   require that this matter proceed only upon indictment of a

12   grand jury of this district.

13       You can waive or give up that right.  If you do give up

14   that right, the matter will proceed against you without any

15   consideration of the matter by a grand jury.  It will proceed

16   solely upon the Government's own information; do you

17   understand?

18           THE DEFENDANT:  Yes.

19           THE COURT:  If you do not give up that right, the

20   matter will not proceed against you unless and until a grand

21   jury of this district finds by returning an indictment that

22   there is probable cause to believe that the offense charged

23   was committed by you.

24       A grand jury is comprised of at least 16, but no more

25   than 23 people, selected at random from the residents of this

```
 1    district.  At least 12 grand jurors must find probable cause

 2    to believe that the offense charged in the proposed

 3    information was committed by you before you could be indicted,

 4    and a grand jury might not indict you for this offense; do you

 5    understand?

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Have you discussed your waiver of

 8    indictment with your attorney and received Mr. Rioux's advice?

 9              THE DEFENDANT:  Yes.

10              THE COURT:  Has anyone made any threats or promises

11    to you in an effort to get you to waive your right to

12    indictment by a grand jury?

13              THE DEFENDANT:  No.

14              THE COURT:  Mr. Rioux, are you aware of any reason I

15    should not permit this defendant to waive indictment?

16              MR. RIOUX:  I'm not, Your Honor.

17              THE COURT:  You indicated that your client has

18    already signed the prescribed waiver form?

19              MR. RIOUX:  Yes, Your Honor.  We have it here.

20              THE COURT:  Would you present that to the clerk.

21         Mr. Ortiz, I have before me a form called waiver of

22    indictment.  There's a signature above the signature line with

23    the defendant's signature; is that your signature?

24              THE DEFENDANT:  Yes.

25              THE COURT:  Did you read this form before you signed
```

1    it?

2                THE DEFENDANT:  Yes.

3                THE COURT:  Did you have a chance to consult with

4    Mr. Rioux concerning the nature of the form and its

5    significance before you signed it?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Did you understand what you were

8    signing?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Did you sign it voluntarily?

11               THE DEFENDANT:  Yes.

12               THE COURT:  I find the defendant has knowingly and

13   voluntarily waived his rights to indictment by a grand jury of

14   this district.  The defendant's waiver of indictment is hereby

15   accepted and the information against this defendant will be

16   filed at this time.  I'm going to return the waiver of

17   indictment form to the clerk.

18           Do I understand correctly that the defendant is now

19   ready for arraignment on the information?

20               MR. RIOUX:  Yes, Your Honor.

21               THE COURT:  Do I understand correctly he intends on

22   arraignment to tender a plea of guilty to the charged offense?

23               MR. RIOUX:  That is correct.

24               THE COURT:  Mr. Ortiz, have you received a copy of

25   the information that I read to you?

1           THE DEFENDANT:  Yes, I have.

2           THE COURT:  Have you had an adequate opportunity to

3    discuss this charge and the case in general with your

4    attorney?

5           THE DEFENDANT:  Yes.

6           THE COURT:  The clerk may inquire.

7           THE CLERK:  Timothy Ortiz, you're charged in Count 1

8    -- in a one count information bearing criminal No.

9    2:18-cr-107.  How do you now plead to the charge contained in

10   Count 1 of the information; do you plead guilty or not guilty?

11          THE DEFENDANT:  Guilty.

12          THE CLERK:  The defendant pleads guilty to Count 1

13   of the information, Your Honor.

14          THE COURT:  Thank you.  Mr. Ortiz, I have a very

15   important question for you, and obviously in this courtroom I

16   require an honest and truthful answer.

17       Have you pleaded guilty to the charge contained in Count

18   1 of the information because you are actually guilty of that

19   crime and for no other reason?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Mr. Rioux, are you satisfied that your

22   client has pleaded guilty because he is actually guilty?

23          MR. RIOUX:  I am, yes.

24          THE COURT:  Have you had enough time to discuss the

25   charge with your attorney?

```
 1                THE DEFENDANT:  Yes.

 2                THE COURT:  Has Mr. Rioux explained to you the

 3    elements and nature of the offense charged?

 4                THE DEFENDANT:  Yes.

 5                THE COURT:  Has he also told you about the penalties

 6    that may be imposed?

 7                THE DEFENDANT:  Yes.

 8                THE COURT:  Mr. Rioux, are you satisfied your client

 9    understands the charge contained in Count 1 of the information

10    and the penalties that may be imposed?

11                MR. RIOUX:  Yes, Your Honor, I am.

12                THE COURT:  I earlier read to you the information.

13    I'm now going to turn to the penalties that may be applicable

14    to the crime to which you are pleading guilty.

15                By pleading guilty to this crime, you're subject to

16    being placed in jail for a period not to exceed ten years.

17    You're subject to a fine not to exceed $250,000 and it can be

18    both prison and the fine.

19                Following any term of imprisonment, you may be placed on

20    supervised release for a period not to exceed three years.  If

21    you were to violate a term of supervised release, you could go

22    back to jail for a period not to exceed two years for each

23    violation.  You are subject to a special assessment of $100

24    and by pleading guilty to this crime, if you're not a United

25    States citizen, you may be removed from the United States,
```

1    denied citizenship and denied admission to the United States

2    in the future.

3          Do you understand that these are the maximum penalties

4    that may be applicable to the crime to which you're pleading

5    guilty?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Now, Mr. Ortiz, I'm sure you understand

8    this, but I want it clear that you do.  You do understand that

9    the law does not require you to come into court today and

10   plead guilty; do you understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  In other words, if you were to tell me

13   right now that you were having second thoughts and you wanted

14   to withdraw your plea of guilty, I would let you right now

15   withdraw your plea of guilty and plead not guilty; do you

16   understand?

17         THE DEFENDANT:  Yes.

18         THE COURT:  You're going to have the right to change

19   your mind and plead not guilty up until the time today that I

20   accept your guilty plea, if I do decide to accept it; do you

21   understand?

22         THE DEFENDANT:  Yes.

23         THE COURT:  I'm going to take a moment and review

24   with you the other rights that you have that you're waiving or

25   giving up by pleading guilty.  You have the right to trial by

1    jury.  You have the right to the assistance of your lawyer at

2    such a trial and if you cannot afford a lawyer, you would have

3    the right to have a lawyer appointed for you at Government

4    expense; do you understand?

5         THE DEFENDANT:  Yes.

6         THE COURT:  At trial, you would be presumed innocent

7    and the Government would have the burden of proving you are

8    guilty beyond a reasonable doubt and you would not have the

9    burden of proving that you're not guilty; do you understand?

10        THE DEFENDANT:  Yes.

11        THE COURT:  At trial, the Government's witnesses

12   would have to come into open court and testify in front of you

13   and your lawyer.  Your lawyer would have the opportunity to

14   cross-examine any Government witness, to object to evidence

15   the Government might offer and to offer evidence on your

16   behalf.  Your lawyer would also have the right to compel the

17   attendance of witnesses at trial who might prove helpful to

18   your case; do you understand?

19        THE DEFENDANT:  Yes.

20        THE COURT:  You would have the right to testify at

21   trial if you wanted to, but you would also have the right not

22   to testify and you could not be required to testify at a

23   trial.  If you chose not to testify, I would instruct the jury

24   that they could draw no inference or suggestion of guilt from

25   the fact you did not testify; do you understand?

1          THE DEFENDANT:  Yes.

2          THE COURT:  If I accept your guilty plea, you will

3     have given up your right to a trial and the other rights I've

4     just described to you and there will be no trial of any kind

5     on this charge; do you understand?

6          THE DEFENDANT:  Yes.

7          THE COURT:  If I proceed to enter a judgment of

8     guilty and sentence you on the basis of your guilty plea, and

9     if all that happens, except for very limited circumstances,

10     you'll have no right of appeal from your conviction; do you

11     understand?

12          THE DEFENDANT:  Yes.

13          THE COURT:  As a part of your pleading guilty, I

14     must find there is a factual basis for your guilty plea and to

15     assure myself of such a factual basis, I will be asking you

16     questions about the conduct that gave rise to this charge and

17     you must answer my questions truthfully; do you understand?

18          THE DEFENDANT:  Yes.

19          THE COURT:  In light of all that I've just explained

20     to you, all the rights that you have that you're waiving and

21     giving up by pleading guilty, do you still choose to plead

22     guilty to the charge contained in Count 1 of the information?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Thank you.  You may be seated.  Ms.

25     McElwee, I have before me a prosecution version of the

1    offense, which is dated August 28, 2019.  Does this

2    prosecution version contain at a minimum the evidence that the

3    Government would bring to bear if the matter were to go to

4    trial?

5              MS. MCELWEE:  It does, Your Honor.

6              THE COURT:  Thank you.  Mr. Rioux, have you had an

7    opportunity to review the prosecution version in this case?

8              MR. RIOUX:  I have, Your Honor, yes.

9              THE COURT:  Are you satisfied the Government can, in

10   fact, produce the evidence that's set forth in the prosecution

11   version?

12             MR. RIOUX:  Yes, I am.

13             THE COURT:  Are you also satisfied, Mr. Rioux, that

14   the admissible part of that evidence would permit a properly

15   instructed jury to determine beyond a reasonable doubt that

16   your client is guilty of the crime to which he is pleading

17   guilty?

18             MR. RIOUX:  Yes, I am.

19             THE COURT:  Mr. Ortiz, would you stand again, sir.

20   I have before me a document entitled prosecution version which

21   is dated August 28, 2019; have you seen that document?

22             THE DEFENDANT:  Yes.

23             THE COURT:  This is a very important document,

24   correct?

25             THE DEFENDANT:  Yes.

```
 1              THE COURT:  It basically sets forth in some detail

 2    what it is the Government says you did to commit this crime;

 3    do you understand that?

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Did you read it carefully to determine

 6    whether it was accurate?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  Now again, I have a very important

 9    question for you, Mr. Ortiz, and require an honest and

10    truthful answer.  Do you disagree in any way with what is set

11    forth in the prosecution version?

12              THE DEFENDANT:  No.

13              THE COURT:  Is the information set forth in the

14    prosecution version true to your own personal knowledge?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Based on my review of the prosecution

17    version, your responses and your lawyer's response, I do find

18    there is a factual basis for the guilty plea to the crime

19    charged in Count 1 of the information.

20         The next part of this process is for me to make sure

21    what you're doing today is of your own free will.  Has anyone

22    threatened you or has anyone attempted to force you to get you

23    in any way to plead guilty?

24              THE DEFENDANT:  No.

25              THE COURT:  I understand there is a plea agreement
```

1    in this case; is that correct, counsel?

2              MS. MCELWEE:  That is correct, Your Honor.

3              THE COURT:  And the earlier plea agreement that had

4    been entered into between the parties regarding the indictment

5    is equally applicable to this charge; is that correct?

6              MS. MCELWEE:  It is, Your Honor.

7              THE COURT:  Is that correct, Mr. Rioux?

8              MR. RIOUX:  That's our understanding, yes, Your

9    Honor.

10             THE COURT:  Other than the plea agreement, Ms.

11   McElwee, has the Government made any formal plea offers to the

12   defendant?

13             MS. MCELWEE:  We have not, Your Honor.

14             THE COURT:  Is that correct, Mr. Rioux?

15             MR. RIOUX:  That is correct.

16             THE COURT:  Is that correct, Mr. Ortiz, you've

17   received no other formal plea offers from the Government not

18   contained in the agreement to plead guilty?

19             THE DEFENDANT:  Yes.

20             THE COURT:  I'm going to ask that you turn to Page 5

21   of the plea agreement.  This is a plea agreement which is

22   dated January 4, 2019, and January 2nd signed by Ms. McElwee.

23   There is a signature line on Page 5 and a signature above the

24   signature line for Timothy Ortiz, defendant; is that your

25   signature?

1           THE DEFENDANT:  Yes.

2           THE COURT:  Did you read this document before you

3   signed it?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Did you have a chance to consult with

6   Mr. Rioux about the significance of the document before you

7   signed it?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Did you understand what you were

10  signing?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Did you sign it voluntarily?

13          THE DEFENDANT:  Yes.

14          THE COURT:  In signing the document, did you intend

15  to agree to all its terms and conditions?

16          THE DEFENDANT:  Yes.

17          THE COURT:  There are a couple of -- there are a

18  number of provisions in this document that I want to be sure

19  you understand.  This says on Page 2, Paragraph 3, that the

20  parties agree to make the following non-binding

21  recommendations as to sentencing.

22          1.  The parties agree that you're subject to a base

23  offense level of 14, that two levels should be added because

24  the offense involved at least one stolen firearm, that four

25  levels are added because the defendant used one of the

1    firearms in connection with another felony offense, namely

2    unlawful trafficking in scheduled drugs and/or voluntary

3    manslaughter, for an adjusted offense level of 20.

4         The parties also agree that the defendant used the

5    firearm cited in the offense of conviction in connection with

6    the commission of another offense, namely voluntary

7    manslaughter, and that death resulted such that United States

8    Sentencing Guideline 2A1.3 applies, and the defendant is

9    subject to a base offense level of 29.

10        3.  The parties agree to recommend that you have

11   accepted responsibility for -- it says offenses, but it should

12   be offense -- of conviction and that the Court should reduce

13   your adjusted offense level by three levels.

14        Finally, the parties agree that an advisory guideline

15   sentence range of imprisonment is appropriate and therefore

16   accordingly, defendant will recommend a sentence of no less

17   than 92 months of imprisonment, and the United States will

18   recommend a sentence of no more than 115 months.

19        For our purposes, the important language is what

20   follows, and it says the parties expressly agree and

21   understand that should the Court reject either or both of the

22   recommendations of the parties -- it should be any of the

23   recommendations of the party -- the defendant will not thereby

24   be permitted to withdraw his plea of guilty.

25        What that in effect means is that these recommendations

1    that you've entered into with the prosecutor are

2    recommendations to the Court only and I'm not bound by those

3    recommendations.  I could accept the recommendations or I

4    could reject the recommendations, and if I reject the

5    recommendations or accept them, and then decide to impose a

6    sentence that is harsher than the one being recommended by the

7    Government, you will not have any right to then withdraw your

8    guilty plea; do you understand?

9             THE DEFENDANT:  Yes.

10            THE COURT:  This goes on to say that you're aware

11   that Title 18, United States Code, section 3742 affords the

12   defendant the right to appeal the sentence imposed.  Knowing

13   that, the defendant waives the right to appeal the following:

14        A.  Defendant's guilty plea and any other aspect of

15   defendant's conviction in the above-captioned case.

16        You may recall that just a little while ago, Mr. Ortiz,

17   I told you your right to appeal your conviction and your

18   guilty plea is going to be limited because you are pleading

19   guilty; do you remember that?  Do you remember that?

20            THE DEFENDANT:  Yes.

21            THE COURT:  However, under the terms of this

22   agreement, and these agreements are usually upheld as a matter

23   of law, you are waiving or giving up any right to appeal your

24   conviction and your guilty plea to a higher court; do you

25   understand?

1              THE DEFENDANT:  Yes.

2              THE COURT:  This goes on to say that you waive the

3      right to appeal the following; a sentence of imprisonment that

4      does not exceed 115 months.

5          Unlike your right to appeal your guilty plea or your

6      conviction, you would have, but for the terms of this

7      agreement, a right to appeal any sentence that I impose; do

8      you understand?

9              THE DEFENDANT:  Yes.

10             THE COURT:  However, under the terms of this

11     agreement -- and again these agreements are usually upheld as

12     a matter of law -- if I impose a sentence of 115 months or

13     less, you are waiving or giving up the right to challenge the

14     legality of that sentence by appealing to a higher court; do

15     you understand?

16             THE DEFENDANT:  Yes.

17             THE COURT:  That means, for all intents and

18     purposes, I will be the only judge if I impose a sentence of

19     115 months or less to review the legality of that sentence; do

20     you understand?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Now, as far as sentencing is concerned,

23     the plea agreement will permit you and your lawyer and the

24     prosecutor to make recommendations regarding your sentence,

25     but the authority to determine the appropriate sentence rests

1      with me as the judge in this court, and if I do not accept

2      those recommendations, you will have no right to withdraw your

3      guilty plea; do you understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Sentencing Commission's advisory

6      guidelines will be considered by the Court in determining your

7      sentence.  I have an obligation to calculate the appropriate

8      -- the applicable sentencing guideline range, to consider that

9      range, to consider possible departures under the guidelines,

10     including increases and decreases.

11         Once I fix the applicable guideline sentencing range, I

12     treat that range as advisory and I sentence you in accordance

13     with certain factors set forth in federal criminal law,

14     including your own history and characteristics, the nature and

15     circumstances of the offense and the need to protect the

16     public from future crimes that you might commit.

17         Have you and your lawyer talked about how these issues

18     may affect your sentence?

19             THE DEFENDANT:  Yes.

20             THE COURT:  I can't determine the advisory guideline

21     sentence until after I've read -- which I have in this case --

22     a presentence report that the probation office will prepare

23     and I've already given your lawyer and the prosecutor an

24     opportunity to challenge the facts in the report.

25         Once I find the advisory guideline, I still have the

1    authority to impose a sentence that is more severe or could be

2    less severe than the sentence called for by the applicable

3    guideline; do you understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  And if I were to do that, if I were to

6    impose a sentence more severe than the one called for by the

7    guidelines, you will still not be permitted to withdraw your

8    guilty plea; do you understand?

9              THE DEFENDANT:  Yes.

10             THE COURT:  If a term of imprisonment is imposed,

11   you will be required to actually serve in a jail or prison all

12   of the imprisonment term, except for any good time deductions,

13   and you'll not be permitted to serve any part of it on parole;

14   do you understand?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Aside from the written plea agreement,

17   has anyone made any promises to you in an effort to get you to

18   plead guilty?

19             THE DEFENDANT:  No.

20             THE COURT:  Has anyone made any promise to you,

21   other than what is set forth in the plea agreement, as to what

22   the prosecutor's recommendation at the time of sentencing is

23   going to be?

24             THE DEFENDANT:  No.

25             THE COURT:  Has anyone made any promise to you as to

1    what kind of sentence I will impose?

2              THE DEFENDANT:  No.

3              THE COURT:  I ask you finally then, do you still

4    wish to plead guilty to the charge contained in Count 1 of the

5    information?

6              THE DEFENDANT:  Yes.

7              THE COURT:  And Mr. Rioux, do you as Mr. Ortiz's

8    attorney still recommend I accept the guilty plea?

9              MR. RIOUX:  Yes, sir.

10             THE COURT:  Mr. Timothy Ortiz, since you acknowledge

11   that you are, in fact, guilty as charged in Count 1 of the

12   information, and since I find there is a factual basis for the

13   plea, and since I find based on your responses to my questions

14   and my direct observations that you are competent to enter a

15   plea, and since I find you know of your right to a trial and

16   the rights associated with the right to a trial, and since I

17   further find you know the maximum possible punishment that may

18   be imposed if you are convicted, and since I find that you

19   have not been coerced, but that you have voluntarily and

20   knowingly tendered a plea of guilty to Count 1 of this

21   information, I now accept your guilty plea as tendered.  You

22   may be seated.

23         Are we prepared at this time to proceed with sentencing?

24             MS. MCELWEE:  We are, Your Honor.

25             MR. RIOUX:  Your Honor, I am going to ask -- members

1    of the defendant's family walked in, I wonder if we might take

2    a very brief recess to get down on paper who is here and who

3    may want to speak, if anyone.

4         THE COURT:  Sure, certainly.  The Court will stand

5    in recess.

6                        (Recess called)

7         THE COURT:  All right.  Are we now prepared to

8    proceed with sentencing?

9         MS. MCELWEE:  Yes, Your Honor.

10        MR. RIOUX:  We are, Your Honor, yes.

11        THE COURT:  Mr. Ortiz, would you stand.  Mr. Ortiz,

12   the purpose of this part of the hearing this afternoon is for

13   me to sentence you.  Before I do that, I'm going to hear from

14   your lawyer, I'll hear from the prosecutor, I will hear from

15   you if you wish to speak to me.

16        I'm going to start by asking you some questions because

17   I want to be sure you're read and reviewed the presentence

18   report as its been revised.

19        I have already determined that you are competent and

20   that determination continues throughout the course of this

21   hearing.  I do want to ask you about your representation by

22   Mr. Rioux.

23        You have been represented by Mr. Rioux, the gentleman

24   standing beside you; is that correct?

25        THE DEFENDANT:  Yes.

1          THE COURT:  Have you been satisfied with Mr. Rioux's

2     legal services?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And do you authorize Mr. Rioux to act

5     and speak for you throughout these proceedings?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Mr. Rioux, has your client received a

8     copy of the written presentence investigation report as

9     revised?

10         MR. RIOUX:  Yes, Your Honor.

11         THE COURT:  Have you had enough time to discuss the

12    contents of the report with him?

13         MR. RIOUX:  Yes.

14         THE COURT:  Mr. Ortiz, have you read the report in

15    its entirety?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Have you had enough time to discuss the

18    contents with your attorney?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Do you know and understand everything

21    that is set forth in the report?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Now, you realize that the reason for the

24    report is to give me information so that I can determine the

25    correct sentence to impose upon you; do you understand that?

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  Knowing that the contents of the report

 3    may affect your sentence, are there any facts in the report

 4    that you believe are in any way inaccurate or incorrect?

 5              THE DEFENDANT:  No.

 6              THE COURT:  Thank you.  You may be seated.  Counsel

 7    have -- as we have discussed -- isolated a guideline's issue

 8    in this case.  I have received, prior to coming in here, a

 9    packet of information that sets forth sentencing exhibits, and

10    I have both the Government's and the defendant's.

11         First, Ms. McElwee, I have before me Government's

12    Exhibits 1 through 5; do you move for the admission of

13    Government's Exhibits 1 through 5?

14              MS. MCELWEE:  I do, Your Honor, and I have the

15    originals here with the exhibits to give to the clerk.

16              THE COURT:  Okay, very good.  Have you seen those,

17    Mr. Rioux?

18              MR. RIOUX:  Yes, Your Honor, I have.

19              THE COURT:  Do you have any objection?

20              MR. RIOUX:  No.

21              THE COURT:  The Court admits Government's Exhibits 1

22    through 5.  I've also received a series of exhibits that I

23    sort of unconventionally marked.  Have you marked them

24    differently or how do you want to proceed with that?

25              MR. RIOUX:  Yes, Your Honor.  My apologies for that.
```

1  We did an index, which was provided, but in the e-mailed copy

2  they were not marked as exhibits.  I have marked them now and

3  I have a copy of the originals for the Court, Exhibits 1

4  through 9.

5          THE COURT:  Have you seen those?

6          MS. MCELWEE:  I have my old set and I have no

7  objection to them being admitted, Judge.

8          THE COURT:  The Court admits sentencing exhibits 1

9  through 9 on the part of the defendant.  I read the very

10  helpful memoranda that has been submitted by counsel.

11      Ms. McElwee, it's your burden, would you like to be

12  heard?

13          MS. MCELWEE:  Yes, Your Honor.  Do you want us to

14  just initially address the one disputed issue?

15          THE COURT:  Yes.

16          MS. MCELWEE:  Judge, I appreciate that you have had

17  what you might call a snapshot of what is alleged to have

18  occurred in that apartment in Biddeford in September of 2016,

19  and Mr. Rioux and I obviously spent a lot of time together

20  talking about our opinions and our perspectives and so we

21  tried to streamline what evidence we could give you so that

22  you would have an opportunity to focus on those pieces of

23  evidence we thought would glean the most accurate picture.

24      To describe the scene of what happened in that apartment

25  hallway that led to Mr. Methot's death as chaotic is an

1   understatement.  It's a very quick event that has a limited

2   number of witnesses, and to be perfectly fair, one of the most

3   critical witnesses to that event was more than reluctant to

4   talk to the police in the very beginning and that's Mr.

5   Williams.

6       He lied to the police, told them he hadn't seen what

7   happened, told them he wasn't even there.  And then prior to

8   the state trial, came forward and told what he claimed was his

9   version of the events and the state made its own decision to

10   not call Mr. Williams.

11       I then reached out, as the Court can see from

12   Government's Exhibit 4, and met with him with my agents and

13   did what we thought was a full debrief of his memory of the

14   event.

15       I submit to you, although you haven't had the

16   opportunity to hear from him yourself, that his statement is

17   consistent with the other witnesses.  I would argue that the

18   most helpful evidence before you is the testimony of Ms. Ball

19   and the statement of Mr. Williams, and I don't think they are

20   as contradictory to each other as the defense suggests.

21       I believe that you can find that both their interactions

22   with Mr. Methot and Mr. Ortiz could coexist.  That Mr. Methot

23   can be arguing with Mr. Williams and that Ms. Ball can insert

24   herself in an attempt to assist Mr. Ortiz, who the Government

25   does not dispute was being choked by Mr. Methot.  And that it

1  was a serious choking and that she felt the need to enter

2  herself, but that she was successful in doing so and that she

3  was able to separate these men and that Mr. Ortiz's initial

4  shot may very well have been in self-defense.

5      That as he pulled that gun from his waistband, he either

6  shot Mr. Methot and didn't cause his death because Mr. Methot

7  continued to move, but that that interference by Ms. Ball

8  separated the two and stopped the threat of deadly force

9  against Mr. Ortiz, which would have allowed him to retreat.

10     That incident, in the Government's view, was over, which

11 makes in our opinion the second and third shots at least

12 voluntary manslaughter, if not murder, but we have taken the

13 position it was voluntary manslaughter, and for purposes of

14 the record, to be clear it literally makes a difference of

15 five months in the guidelines because of the statutory

16 maximum.  So to say it was murder, to pursue that was just not

17 something that was necessary in this case.

18     But Mr. Williams' statement is that after Ms. Ball runs

19 away, which she says she does to go into the back room to

20 address the fact that there's two young girls there, one who

21 is under 18, Mr. Ortiz's paramour and the sister, who is

22 dating or seeing Mr. Williams, she runs, to quote as she

23 testified, check on those two girls.  She's out of sight,

24 she's out of view and she says she hears the second or third

25 shot, but that means she has enough time to get into another

1   room out of sight to not see what Mr. Williams claims he saw

2   and felt, which was Mr. Ortiz's arm coming up over his

3   shoulder and Mr. Ortiz saying oh yeah to Mr. Methot as he

4   shoots him in what the medical examiner says is the face

5   causing his death.

6       I submit that the Government's first four exhibits

7   support that theory of the event, that it isn't inconsistent

8   with the defense's exhibits and that for those reasons, the

9   Court can find that at least 17-A, section 203 of the Maine

10  statute, which charges voluntary manslaughter, that is that

11  Mr. Ortiz recklessly caused the death of another person, has

12  been met.

13      THE COURT:  But we -- we wouldn't -- for guideline

14  purposes, we wouldn't be using the state definition.  We would

15  be using the federal definition of voluntary manslaughter.

16      MS. MCELWEE:  That's correct, Judge.  That's

17  correct.  And I would submit for the same reasons that that is

18  met as well.

19      You are correct about that, and I'm happy to answer any

20  questions you have about that.  I don't want to get into the

21  weeds, unless you'd like me to, on any particular witness or

22  statement, but that's our theory of the event.  That the first

23  shot might have been self-defense, but that the second and

24  third, which actually caused his death, was at least voluntary

25  manslaughter.  Thank you.

1          THE COURT:  Thank you very much.  Mr. Rioux.

2          MR. RIOUX:  Thank you, Your Honor.  Your Honor, I

3    think there's some value that this Court might carefully

4    consider and may find that the manslaughter statute does not

5    apply here.

6          It appears, first off, Mr. Ortiz did go to trial in this

7    case and was acquitted of the state court charge of

8    manslaughter.  Federal law of manslaughter is the unlawful

9    killing of a human being without malice, voluntary in this

10   case, and it's an interesting question because the

11   unlawfulness would be generally determined under state law,

12   which did not find the killing unlawful.  In fact, found the

13   killing justified.

14         Still a horrible tragedy and a horrific event,

15   underlying circumstances, but the question specific for this

16   Court is really whether that is an unlawful killing under the

17   federal conception.

18         THE COURT:  Can I ask you about the -- how you

19   interpret the plea agreement and your role?

20         The plea agreement provides that the parties agree that

21   the defendant used a firearm cited in the offense of

22   conviction in connection with the commission of another

23   offense, namely voluntary manslaughter, and that death

24   resulted such that United States Sentencing Guidelines,

25   section 2A1.3, applies and that the defendant was subject to a

1    base offense level of 29.

2         How do you see that in terms of whether the plea

3    agreement allows you to argue that 29 doesn't apply?

4         MR. RIOUX:  Right.  Well, Your Honor, we've made a

5    non-binding recommendation on the Court and came to that

6    agreement through a lot of negotiations with the prosecution.

7    While it's still our -- while we're still bound by the plea

8    agreement and the prosecution hasn't argue we're breaching it,

9    we have not waived our right to have an independent tribunal

10   to consider the issue and apply the appropriate guideline

11   sentence.

12        And so while we made our recommendation, I also

13   understand the difficult position the Court's in and the

14   challenging legal issues presented here, and I think there is

15   some more reason that the Court has to grapple with this and

16   may have trouble applying that guideline range.

17        If you look to the statement that -- so Mr. Williams has

18   offered in his testimony -- in our view it's inconsistent with

19   the physical evidence found at the scene and through the

20   testimony of other witnesses he has explained in his most

21   recent statement, I believe, that he saw three shots fired

22   while the butt of the gun was on the shoulder.

23        As I've tried to show the Court, as I understand Mr.

24   Williams' statement, Your Honor, the diagram that we have that

25   would have put Mr. Williams somewhere in the doorway to the

1    living room with Mr. Ortiz behind him -- my Exhibit 1 is that

2    diagram -- firing with the gun placed across Mr. Williams'

3    shoulder at Mr. Methot, who was very near the basement door

4    under the stairway.  What we know from the medical examiner's

5    testimony and report is that the fatal round is the only round

6    that struck Mr. Methot, and that it was fired from a distance

7    of nearly point-blank range, within arm's length away.  That

8    doesn't make sense with the -- in recounting what Otis has

9    given in his July statement.

10            THE COURT:  So I have this in front of me.  It says

11   not to scale, so that doesn't give me an idea of any of the

12   distances here.

13            MR. RIOUX:  While it's not to scale, I think it does

14   give you an idea of the relationships of the distances.

15            THE COURT:  Where in -- so that I understand, where

16   do you understand is A, B, C and D since they're not really

17   identified?

18        Where do you understand Mr. Otis says -- Mr. Otis -- he

19   was and where he says that Mr. Williams says where Mr. Ortiz

20   was and Mr. Methot and where do you understand that Mr.

21   Williams says Mr. Ortiz was and Mr. Methot was at the time of

22   the shootings?

23            MR. RIOUX:  Well, Mr. Williams' statement says that

24   he was standing with his back to the living room, and so I

25   take that to mean that he was standing near the doorway or, I

1    guess, more like pass through from the front of the entry

2    hall, you would take a left and pass into the living room.

3              THE COURT:  Right.

4              MR. RIOUX:  I understood that to mean he was

5    standing near that entrance to the living with his back sort

6    of toward that couch as depicted in the diagram.

7         And my understanding he was facing -- there's an arrow

8    toward number B -- letter B, he would have been facing that

9    arrow point with Mr. Methot standing very near the point of

10   that arrow.  But if the Court is then -- Mr. Ortiz came up

11   from behind Mr. Williams --

12             THE COURT:  So Mr. Ortiz had to come from somewhere

13   back in the living room there?

14             MR. RIOUX:  Yes.  That's what it seems to be

15   recounting.

16             THE COURT:  And then what's the -- can you give me

17   the estimate of the distance between wherever you say Mr.

18   Williams -- or for that matter the defendant -- were standing

19   and Mr. Methot at the time that he was killed?

20             MR. RIOUX:  So I -- from other information that was

21   not provided here, and perhaps should have been, there were

22   photographs taken of this hallway which did give us a sense of

23   the scale there.

24        The short leg of that hallway, when you turn to go to

25   the living room was some number -- perhaps at least five feet

1    or so in length.  Not terribly long, but something on that

2    order because you did -- it's a standard width sort of

3    hallway.  You turn the corner and a short distance to the left

4    and you walk into the living room and that would mean that

5    there's at least some number of feet of range between the

6    location where it appears Otis Williams is describing himself

7    standing.

8        Mr. Ortiz walked up from behind and discharged the

9    firearm from approximately his shoulder towards the base of

10   the door area where Mr. Methot was standing.  So, it would be

11   a range at least a number of feet, whereas the medical

12   examiner report seems to indicate perhaps a matter of a half

13   inch or an inch, perhaps even contact in that range of

14   distance and --

15       THE COURT:  He says anywhere from perhaps a half an

16   inch to not -- maybe not more than 3, 4 or 5 inches.

17       MR. RIOUX:  Something like that.  And so

18   additionally, Mr. Williams' statement does nothing to account

19   for the round which was recovered from the stairway area.  We

20   do know that one round went through the balusters of the

21   stairway in the approximate area of the third stair on the way

22   up, crashing through the balusters and lodged in the wall

23   behind -- to the right of the stairs.

24       From Mr. Williams' account, there's no way that that

25   round could have ended up in that location from the layout as

1    I see it.  I guess it is possible that another shot was fired.

2    The revolver was recovered with -- it's a six-shot revolver --

3    with three shots coming out of it or three rounds missing.  So

4    there was one round recovered from Mr. Methot's body, another

5    round recovered that had penetrated the basement door and then

6    the round from the stairwell.

7              THE COURT:  Where is the basement door here?

8              MR. RIOUX:  It would be the arrow letter B.  It's

9    under the top of the stairs, if you will.

10             THE COURT:  Okay.

11             MR. RIOUX:  And that would take you downstairs and

12   another flight of stairs that was parallel to the stairs in

13   the second floor would also descend to the basement with the

14   rounds that were then recovered.  So if it goes through a

15   basement door, there's a 90-degree turn with some cabin

16   shelving and it was recovered from that area.

17        We also have the testimony of Ms. Cox or Ms. Ball, which

18   is completely unaccounted for in Mr. Williams' recitation of

19   events.  While it's possible perhaps he only witnessed a

20   portion of the event, he couldn't see Ms. Ball.  The struggle

21   that ensued in the front hallway seems unlikely given the

22   proximity of everyone and the sort of state of alert that

23   everyone was on.

24        If we take Ms. Ball's statement as being accurate or

25   close to accurate, what we do appear to know is that an

1   additional round was discharged from that front entry hall

2   further up toward the exit and that somehow the parties ended

3   up going further into the house and then a round was fired at

4   approximately 90 degrees to the area of the original

5   altercation to penetrate that basement door and ultimately the

6   fatal shot that was also fired around that same area.

7        I had argued at trial that this demonstrated that when

8   the gun came out, Mr. Methot did not retreat.  When the first

9   shot was fired, he did not retreat.  After the first shot was

10  fired, he pursued Mr. Ortiz deeper into the house.  Mr. Ortiz

11  went around the corner towards the living room and the

12  distance between Mr. Ortiz and Mr. Methot was closed due to

13  within approximately an arm's length because of the range of

14  discharge of the fatal shot and it was at that point that the

15  fatal shot was fired.

16       None of that is really accounted for in Mr. Williams'

17  statement.  His statements were very inaccurate.  He clearly

18  lied in some of these statements.  They can't all be true and

19  even the most recent statement doesn't account for many facts.

20  In fact, he changed his story about other details about who

21  took money or who was to deliver drugs, which is reasonably

22  insignificant to the manslaughter charge in general, but

23  perhaps undercut his reliability as to the source of

24  information here.

25       So, while we did execute the agreement, while we have

1    made a recommendation to the Court, ultimately it's this

2    Court's decision that is binding and it's a difficult issue to

3    grapple with because of the acquittal in the state court

4    matter.  The question of whether there's an unlawful killing

5    is fundamentally a significant one.  That's all I have on that

6    issue.

7              THE COURT:  Thank you very much.  Anything further?

8              MS. MCELWEE:  Very briefly, Judge.  I think if I'm

9    focusing on what the defense highlights as their strongest

10   argument or a strong argument -- I appreciate that he's

11   staying with his plea agreement and he is -- what it comes

12   down to from that perspective for me to suggest to you is that

13   there are three shots fired.  Everyone agrees there were three

14   shots fired.  One of those shots killed Mr. Methot.  All three

15   were fired by Mr. Ortiz and if you want to focus on Ms. Ball,

16   she was able to get away and leave the room.

17             So enough distance and separation of those men occurred

18   for her to be able to get away and I would suggest that when

19   Mr. Rioux says what's missing from Mr. Williams' story is the

20   defendant's view of what must have happened based on the

21   ballistics, you now have someone who's standing there saying I

22   don't know who Ms. Ball is because when Mr. Methot died, she

23   wasn't standing there and that appears to be true.

24             And so if enough distance is placed between the two men

25   and she can get away, then the fatal shot that could be --

1  appears to be scientifically determined to have been inches

2  when Mr. Methot's face could also be Mr. Ortiz reaching over

3  Mr. Williams to kill Mr. Methot, which is completely

4  consistent with Mr. Williams' story.  Thank you.

5          THE COURT:  Thank you.  So the parties here have

6  raised a significant issue about the appropriate guideline

7  calculation in this case.

8          To set the stage, the presentence report, which was

9  revised on April 4, 2019, recommends a base offense level

10  under section 2K2.1(a)(6)(A) of 14 because at the time of the

11  offense, the defendant was a prohibited person.

12          Under section 2K2.1(b)(4)(A), a two level enhancement is

13  recommended because one of the firearms the defendant

14  possessed was stolen.

15          Under section 2K2.1(b)(6)(B), there's a four level

16  increase for his possession in connection with another felony

17  and in the presentence report, the probation office suggests

18  the felony was murder and under section 2K2.1(c)(1) and

19  2A1.3(a), the base offense level increases to 29 because the

20  other felony was voluntary manslaughter, and under the

21  recommendation of the probation office, he's given acceptance,

22  which would result in a total offense level of 26.

23          He's a criminal history Category IV.  Under that

24  calculation, the low-end of the guideline range for jail is

25  92 months and the high-end 115 months.  The fine would be

1    25,000 to $250,000.  Supervised release one to three years and

2    a special assessment of $100.

3         This 92 to 115 months is in sync with the plea agreement

4    where the defendant is allowed to urge the Court to impose a

5    sentence of 92 months and the prosecution is allowed to

6    recommend up to 115 months.

7         As I mentioned, the parties have entered into a plea

8    agreement, which was dated January 2nd and January 4th, 2019.

9    I reviewed that earlier today.  Paragraph 3B states that the

10   parties, quote, agree that the defendant used the firearm

11   cited in the offense of conviction in connection with the

12   commission of another offense, namely voluntary manslaughter,

13   and that death resulted such that section 2A1.3 applies and

14   that the defendant is subject to a base offense level of 29.

15        It also refers to these guideline agreements as

16   recommendations; in other words, although Rule 11 does allow

17   for the parties to enter into binding recommendations to the

18   Court, this is not what is called a Rule 11(c)(1)(C) binding

19   recommendation, and the Court has the inherent authority

20   either to accept or reject the recommendation of the parties.

21        The further background to this issue is set forth in

22   Paragraph 37 of the presentence report, which describes the

23   state charge of murder and manslaughter against the defendant.

24   The presentence report simply states that on June 25, 2018,

25   the defendant was found not guilty of murder and manslaughter

1    after a trial in York County.

2         For many people, it might strike it as odd and unfair

3    that a federal court could increase someone's sentence based

4    on an allegation that he actually committed an offense with

5    which he went to trial and was found not guilty and before

6    1997, the 1st Circuit took a dim view of the use of what is

7    called acquitted conduct to enhance a sentence.

8         Here, I'm talking about United States versus Lamoub,

9    which is L-A-M-O-U-B, 71 F.3d 966, a 1995 1st Circuit case.

10   In Lamoub, the 1st Circuit describes the notion that the court

11   could use good conduct as, quote, utterly lacking the

12   appearance of justice, end quote.

13        And there are other pre-1997 1st Circuit cases that

14   express similar skepticism, but in 1997, the United States

15   Supreme Court decided a case called United States versus

16   Watts, which is 519 US 148 at 157.  In Watts, the Supreme

17   Court held that a prior jury acquittal of conduct, quote, does

18   not prevent the sentencing court from considering conduct

19   underlying the acquitted charge as long as that conduct has

20   been proven by a preponderance of the evidence.

21        Since Watts, the 1st Circuit has acknowledged that a

22   sentencing court may consider acquitted conduct in determining

23   the sentencing enhancement.  The case of United States versus

24   DeSimone, which is 699 F.3d 113, a case decided in 2012, it's

25   perhaps the seminal case, but in a somewhat analogous

1    situation, an arrest that did not result in a conviction have

2    been the source of consternation on the part of the 1st

3    Circuit.  And just this year in the case of United States

4    versus Marrero-Pérez, the 1st Circuit warned that trial judges

5    should not use arrests alone to enhance a sentence without

6    further proof of the underlying facts.  That's at 914 F.3d 20,

7    a 2019 case.

8        The most biting criticism of the use of acquitted

9    conduct that I was able to find in this Circuit is found in an

10   opinion by former Judge Nancy Gertner in United States versus

11   Pimental, which is 367 F. Supp 2d 143, a 2005 case, and she

12   questioned whether Watts was still viable after United States

13   versus Booker, but she also expressed concerns about the

14   impact of this rule in terms of the respect that the judicial

15   system shall afford a jury as an institution if the judge uses

16   conduct that a jury acquitted a person for to enhance a

17   person's sentence.

18       So the summary of this is that I acknowledge that under

19   the guidelines, and under both the Supreme Court and the 1st

20   Circuit case law, I have the authority, and for that matter

21   under the plea agreement I have the authority to enhance the

22   defendant's sentence based on acquitted conduct.

23       I would note the standard of proof is different at

24   trial.  Of course it's beyond a reasonable doubt at the jury

25   trial in state court where the defendant was acquitted and

1    here, the standard is a preponderance of the evidence, which

2    is much lower.

3         And I acknowledge that there may be a good reason in a

4    specific case to use acquitted conduct, but in general I fall,

5    as a matter of judicial review more on Judge Redeem's cant, as

6    shared by Judge Gertner, that simply because, quote, a

7    practice is constitutional does not make it wise, and that's

8    found in the case of United States versus Lumbar, 102 F.3d 1,

9    a 1996 case.

10        So that's my general view of the use of acquitted

11   conduct, but I acknowledge that the law permits me to do so

12   and I take my obligations seriously.

13        The issue here is found under the language of section

14   2K2.1(C)(1) and says this; if the defendant used or possessed

15   any firearm cited in the offense of conviction in connection

16   with the commission of another offense, apply D.  If the

17   death -- if death resulted, the most analogous offense

18   guideline is Chapter 2 Part A (1) homicide.  Chapter 2(A)(1)

19   contains five levels of offenses against a person involving

20   death and the probation officer -- office and the Government

21   proposed the Court should use section 2A2.13, voluntary

22   manslaughter, and as I mentioned this results in a base

23   offense level of 29.

24        Section 2A1.3 voluntary manslaughter refers to a number

25   of statutory provisions in federal law.  The most relevant

1    being 18 USC, section 1112.  That provision is the voluntary

2    manslaughter and involuntary manslaughter provisions of the

3    federal statute.

4        Turning to voluntary manslaughter, section 1112(A) says,

5    quote, manslaughter is the unlawful killing of a human being

6    without malice, and it defines voluntary manslaughter as,

7    quote, upon a sudden quarrel or heat of passion.

8        I'm going to turn back to that at the end, but I'm now

9    going to turn to what evidence is before me.  The evidence, as

10   I've mentioned, is in the PSR said the defendant admitted the

11   contents of it at the outset of this hearing, Government's

12   Exhibits 1 through 5, and then Defendant's Exhibits 1 through

13   9.

14       Preliminarily, I would note that the circumstances of

15   Jonathan Methot's death require me to enter into really a

16   dark, chaotic environment world.  Most, but not all, of the

17   people involved in this tragedy were drug addicts at the time.

18   Many of them, not all, of the critical witnesses were either

19   using drugs or alcohol during the hours leading up to Mr.

20   Methot's death.

21       There is a well-known expression about the fog of war,

22   and here it seems to me I'm presented with the facts of the

23   fog of crime.  There's a certain amount of chaos, emotional

24   reaction, retrospective analysis and any violent crime -- and

25   here we have a violent crime that is compounded with drugs,

1    sex trafficking, prostitution, violence, and the same thing,

2    I'm not denigrating anyone.  My job unfortunately has

3    routinely brought me into contact with people who suffer from

4    addiction and suffer profoundly from addiction and their lives

5    go into a black hole for at least a period of time.

6         It's always to me very sad they've reached a terrible

7    rough spot in their lives and despite this rough spot,

8    witnesses who have terrible addictions often tell the truth.

9    But they also, as is evident in this case, often sometimes

10   pull themselves out of the black hole they're in and become

11   more wiser and more disciplined people.  But my assessment of

12   the probative value of their testimony is somewhat handicapped

13   by the limitations of their own perceptions.

14        I see at least three versions of what happened when

15   Jonathan Methot was killed.  I'm going to refer to them as

16   Brittany Cox, because that's what she was known as back then,

17   Otis Williams and the defendant's.  They're not all entirely

18   inconsistent as has been pointed out before I recite these

19   versions as for background.

20        In September of 2016, Brittany Cox was about 30 years

21   old and, as I mentioned more recently, she has certainly

22   turned her life around, which is really edifying, but in

23   September of 2016, she was addicted to crack cocaine and

24   heroin and her addiction had led her to prostitution to

25   support her habit.

1          She had actually put an ad, essentially a prostitution

2     ad, in BackPages looking for clients and on September 25,

3     2016, the day before Mr. Methot was killed, Ms. Cox received a

4     message from the defendant and the defendant told her that he

5     was not looking for sex, but he wanted her to drive him

6     around.  Ms. Cox said she thought it was amazing compared to

7     what she had been doing.

8          Ms. Cox traveled to Westbrook, met the defendant, and he

9     told her he could not see, he had bad vision so he needed a

10    driver.  Ms. Cox and the defendant smoked marijuana and at

11    that time the defendant showed her a handgun.  Ultimately, Ms.

12    Cox drove the defendant at his direction to a motel in

13    Biddeford where they met the defendant's then girlfriend, a

14    woman by the name of Courtney who was at a Biddeford hotel.

15         They had some dispute and Mr. Ortiz was not happy, but

16    after some further driving, Ms. Cox drove the defendant to

17    West Cutts Street in Biddeford where this -- where Mr. Methot

18    was killed.

19         When the defendant and Ms. Cox arrived at West Cutts

20    Street, Ms. Cox went inside and she found Courtney, the

21    defendant's girlfriend, as well as two other women sitting

22    there.  They were not using drugs at that point.  Also present

23    was this man Devon Otis Williams.

24         There's some controversy as to whether Otis Williams,

25    which is the name he goes by, was dealing drugs for the

defendant or was dealing drugs for somebody else.  I don't

think it's really essential for me to resolve that and

instinctively, I have the sense that he probably was dealing

for the defendant, but he was probably also dealing for other

people as well.

Three of the women, including Ms. Cox, started smoking

crack and Otis and the defendant started drinking.  At that

time the defendant and Courtney went out to get some

cigarettes and they disappeared for a period of time.  While

the defendant and Courtney were gone, Jonathan Methot came to

the apartment house.

Now, I should say a word about this apartment house.

Some witnesses describe it as a trap house or a flophouse

because that's where drugs were sold and taken.  It was

described as a mess, covered with junk everywhere.  Ms. Cox

recognized Mr. Methot from her use of drugs and Mr. Methot and

Otis Williams went off somewhere.

Next thing that happened is Otis Williams gets into a

furious argument with a woman who lives upstairs and,

according to Ms. Cox, the woman was being very derogatory to

Mr. Williams and Ms. Cox, which is established on the record,

texted the defendant, and this was about midnight on

September 26, 2000 -- just after that, September 26, 2016, and

she wrote get in here, the bitch upstairs is starting with

your boys.  That's some indication though that Mr. Williams

1    was, in fact, looking for the defendant.

2         The defendant returned with Courtney and argued with the

3    woman upstairs and at this point, Mr. Methot and Otis Williams

4    began arguing.  Mr. Methot had paid $40 to Mr. Williams for

5    some crack and Mr. Williams, according to Mr. Methot, had not

6    delivered the crack, or at least had not delivered it as

7    promptly as he wanted, and it was at this point the defendant

8    who returned became involved in the argument between Mr.

9    Methot and Mr. Williams, and that's a fair summary or

10   background that led up to this shooting.

11        The lawyers have presented me with three different

12   versions.  Some of them, as I've mentioned, are similar.  I am

13   handicapped because I don't know these people.  I don't --

14   never have seen, to my knowledge.  Brittany Cox, I've never

15   seen Otis Williams.  I have seen the defendant, but I can't --

16   but he has never testified before me, so I'm at somewhat of a

17   disadvantage.

18        I'm also a little -- although the matter was

19   investigated, there are other witnesses or potentially other

20   witnesses in the house at the time, other women and I don't

21   know what they know.  They may have heard something that would

22   confirm or disprove some of this, but I don't know anything

23   about what they would say.

24        Turning to Brittany Cox, she said she went to the

25   bathroom and when she walked out, she saw the defendant and

1    Mr. Methot in the hallway.  She said that Mr. Methot had his

2    hands around the defendant's throat and was choking him and

3    that the defendant was losing color.  His eyes were bugging

4    out.  This seems like a pretty serious strangling from what

5    she described.

6         She began banging on Mr. Methot's arm and he finally let

7    go of the defendant.  The defendant and Mr. Methot then

8    stepped away to confront each other and the defendant pulled

9    out a gun.  In response to what the defendant did, Mr. Methot

10   then grabbed Brittany Cox's sweatshirt, holding her against

11   him like a shield.

12        Now, at that point the defendant has the gun out and

13   Brittany Cox said that she struggled to get away because she's

14   facing the end of the gun.  As she's struggling to get away,

15   the defendant shot the pistol.  Now, immediately after that,

16   Mr. Methot loosened his grip on Ms. Cox and Ms. Cox ran toward

17   the defendant and basically steps out by the defendant and she

18   initially tried to get out a blocked door and finally escaped

19   out a window.

20        When she got to the car, amazingly the defendant was

21   already there and Courtney was already there along with two

22   other women.  She thought, based on her interaction, that it

23   was that shot, while she was being held by Mr. Methot, that

24   killed this man and she arrived at that conclusion mostly

25   because he released her.

1          Also of interest is the fact that at one point Ms. Cox

2     started to cry.  This was when they were driving around after

3     the incident and she said to the defendant thank you for not

4     shooting me and he replied why would I shoot you, you're my

5     friend?  The defendant then also went on to say that she

6     shouldn't cry for Mr. Methot because he tried to use her as a

7     shield.

8          Now, Otis Williams has been presented as a potential

9     witness here.  He was clearly at the scene.  He has presented

10     a number of different versions of this event.  The first was

11     on the date of the incident on September 26, 2016 -- and

12     Detective Ross of the Maine State Police interviewed him.  He

13     initially denied being at West Cutts Street and then he said

14     he had been drinking with the defendant.

15          He said he went downstairs to get his sweatpants and

16     when he came back up, one of the neighbors hit him with a

17     baseball bat and he saw a dead body on the front porch.

18          The second interview took place on May 9, 2016.

19     Detective Warren Hedstrom of the Maine State Police

20     interviewed him and at that point, Mr. Williams confirmed he

21     knew most of the people at West Cutts and he said he had been

22     drinking heavily and he did not remember much and he learned

23     mostly before the shooting from others.  And he sat down a

24     third time May 24, 2018, with Detectives Hedstrom, Ross and

25     Assistant State Attorney Meg Elam.

1          At that point, Mr. Williams said that his father had

2     told him to tell the truth.  He said that Mr. Methot had

3     accused him of taking money from him and that Williams had

4     denied it.  As we've heard, Mr. Williams said he was standing

5     in the doorway at the living room and Mr. Methot was standing

6     with his back to the basement door.  The defendant said he

7     came up from behind him, put a gun on his shoulder and shot

8     Mr. Methot three times.

9          Then we have the defendant's version, which is actually

10    set forth in Paragraph 16 of the presentence report.  The

11    defendant says he was trying to calm Mr. Methot down.  Mr.

12    Methot tried to choke him or started to choke him and he

13    couldn't breathe and he felt light-headed.  He confirmed that

14    Ms. Cox hit Mr. Methot in the arm and he let go, but he did

15    not leave and then Mr. Methot was still angry.

16         The defendant says he pulled a gun because he thought

17    Mr. Methot would attack again and he thought the gun would

18    scare him off.  At that point, Mr. Methot grabbed Ms. Cox and

19    she looked scared.  The defendant fired the gun and Ms. Cox

20    ran off, but Mr. Methot was not scared, according to the

21    defendant, and he started coming at him.  The defendant said

22    he backed off, but Mr. Methot kept coming and that he fired

23    two times and the last one stopped Mr. Methot.

24         So, which of these versions does the Court accept?

25    First, regarding Otis Williams' version, I find that version

1    to be improbable.  First, he's given three different versions

2    in three different interviews so he has a basic credibility

3    issue.

4         Second, there was an autopsy by the State Medical

5    Examiner, a doctor by the name of Mark Flomenbaum.  He said

6    that Mr. Methot was killed by a shot to his face and the cause

7    of death is listed as gunshot wound of face and neck with

8    perforation.  And he offered testimony that because of gun

9    powder residue around the entrance wound, the gun had to have

10   been very close to Mr. Methot's face.  He put it somewhere

11   between half an inch to 3 or 4 inches away, and I just simply

12   couldn't put together that closeness of that shot with his

13   description of the defendant standing behind him and shooting

14   over his shoulder.  I think the distance is just incompatible

15   with the science.

16        I found Brittany Cox's version more likely than Otis

17   Williams', but I'm really having a very difficult time

18   concluding that the defendant shot Mr. Methot in the face

19   while Mr. Methot was holding on to Ms. Cox.

20        My skepticism is based on a couple of things.  First,

21   Ms. Cox said she drove to Westbrook right after the incident.

22   She said that when she got to Westbrook -- and you remember

23   they had -- the other women were there with her and when they

24   entered the apartment, she immediately told the other women to

25   shower and change their clothes, but she herself went into the

1       bathroom apparently and she wore the same clothes the rest of

2       the day.  I find that hard to believe.

3            That if, in fact -- so you have Mr. Methot holding her

4       close, grabbing on to her sweatshirt and then a significant

5       wound, something that's significant enough to kill Mr. Methot

6       in his face, and I found it hard to believe that she would not

7       shower and change her clothes.  It's just too close.  All of

8       the other women immediately did that and she remained in the

9       same clothes all day.  I just found that hard to understand.

10           The other part that I found unusual is Ms. Cox's

11      statement to the defendant after the shooting.  What she said

12      to the defendant was this:  Thank you for not shooting me like

13      you could have shot me.  So Mr. Methot has Ms. Cox by the back

14      of the sweatshirt, she's squirming to get away and the

15      defendant fires a shot that just misses Ms. Cox's head and

16      strikes Mr. Methot.

17           It strikes me as you would not be thanking someone who

18      had done that.  You'd be saying you almost killed me.  You

19      wouldn't be saying thank you for not killing me.  You'd be

20      saying literally the bullet went right by my face and killed

21      someone else.  You'd say my God, you nearly killed me; what

22      were you doing?

23           So I'm willing to credit Ms. Cox's testimony up to the

24      point of the first shot.  I also note that she said she

25      believed that Jonathan Methot was struck by the first shot

1    because he let go of her, but that's equally consistent with

2    the defendant firing a warning shot, startling Mr. Methot and

3    having him release her for all sorts of reasons, among which

4    might have been that he didn't want her to die because he now

5    knew at that point that the defendant was deadly serious.

6         So then Ms. Cox runs away and according to what is

7    before me, there are only two people who know what happened.

8    One of them is sitting in this room and the other is dead.

9    What we do know is that Mr. Methot was unarmed and the

10   defendant had the firearm, which was loaded.  The defendant

11   says Mr. Methot, let go of Ms. Cox after the first shot and

12   then started toward him and when he came near, effectively the

13   defendant shot him in the face.

14        We really can't know what the truth is.  I view the

15   defendant's version as possible, but against that version is

16   the idea that Mr. Methot -- placed Mr. Methot alone with a man

17   who just shot a gun, he knew the defendant had a gun, he knew

18   it was loaded, he knew he had fired a shot and yet he didn't

19   turn and run away.  According to the defendant, he marched

20   toward him, which would be, I should say, foolhardy.

21        I also found it interesting -- I quoted the defendant in

22   what he said to Ms. Cox afterwards and the defendant said to

23   Ms. Cox when she thanked him for not shooting her, he said

24   first I didn't shoot you because you're my friend.  Now, that

25   to me -- and he also went on to say the defendant (sic) was a

1    coward because he used you as a shield.

2         These statements by the defendant himself suggested the

3    defendant may have shot Mr. Methot because he thought he was a

4    coward and because he didn't consider him a friend.

5         There is some evidence that the defendant was dismissive

6    and derogatory toward people who are addicted and Mr. Methot,

7    unfortunately, from the information before me, had a

8    significant problem with drugs.

9         It strikes me that there are really two possibilities.

10   One is these two men are standing in the hallway and, as Mr.

11   Ortiz said, Mr. Methot came toward him and the defendant shot

12   him.  Now, if that happened, it strikes me that -- and I'll

13   talk about self-defense -- it strikes me that in all

14   likelihood self-defense is applicable.  After all, the man

15   approaching Mr. Ortiz was the man who, but for Brittany Cox,

16   may have strangled him to death so he knew that if Mr. Methot

17   was approaching him that he would suffer the same fate if he

18   didn't protect himself.

19        The other alternative is that the defendant, who has a

20   terrible temper and he talks about his temper in a Facebook

21   post having been -- having escaped suffocation by Mr. Methot

22   was having none of him and just got mad, took the gun, walked

23   up and killed him.  Based on the evidence however, and it

24   pains me to describe the evidence in detail, I cannot find

25   that the defendant has proven that the -- that the Government

1    has proven that the defendant committed voluntary

2    manslaughter.

3         Voluntary manslaughter, as defined under federal law,

4    requires to be a heat of passion.  That's under the statute

5    and under United States versus Holmes, which is 632 F.2d 167,

6    a 1980 case.  The 1st Circuit wrote guilt is established when

7    the defendant inflicted the injury that caused the death and,

8    quote, the homicide was permitted without justification or

9    excuse, end quote.

10        So the issue narrows down to self-defense.  There are

11   three elements under 1st Circuit law.  First, the defendant

12   acted under an immediate threat of serious bodily injury or

13   death; second, that he had a well-rounded belief that the

14   threat would be carried out; and third, that he had no

15   reasonable opportunity to escape or otherwise frustrate the

16   effect.

17        If it appears true Mr. Methot had strangled the

18   defendant to the point of his eyes bulging and his face losing

19   color, then the defendant had acted under an immediate threat

20   of serious bodily injury or death as Mr. Methot approached

21   him.  He had a well grounded belief that Mr. Methot would

22   strangle him again, or at least try to, and given the close

23   quarters and Mr. Methot's approach -- and we're talking here a

24   matter of feet and maybe inches -- it was reasonable to

25   conclude that there was no effective opportunity to escape or

1   frustrate the threat.

2       The other alternative is the one that I just described

3   and that simply is that the defendant got angry, felt the rage

4   of what Mr. Methot had done to him and decided just to execute

5   him.  But I have to say there's virtually no evidence of that

6   occurring in what I have before me.  I just have no evidence

7   of -- the only evidence I have is from the defendant and the

8   defendant's story as we heard is that Mr. Methot came up to

9   him and so to arrive at that conclusion would require me to

10  speculate.

11      Under the law, the burden to prove the enhancement is on

12  the Government and based on what the Government has produced

13  and the defendant, I do not find they've produced sufficient

14  evidence first to find out what actually happened.  I really

15  am still uncertain exactly what happened in that critical few

16  seconds when no one but the defendant and Mr. Methot were

17  standing looking at each other at West Cutts Street, or to

18  find that the defendant's version did not take place and under

19  either, the enhancement fails.

20      I will say this doesn't end the guidelines analysis.  I

21  noted that the probation office recommended a four level

22  enhancement under section 2K2.1(b)(6)(B) for possession of a

23  firearm in connection with another felony.

24      The PSR says the other felony is murder, but there is,

25  in my view, ample evidence that the defendant possessed a

firearm in connection with the drug dealing.   Paragraph 10 says the defendant possessed a revolver on numerous occasions and often waved it around.

Christine Palmer said that she was a drug addict at the time and that she went to West Cutts Street to get drugs from the defendant.   She says she saw the defendant at West Cutts Street with a gun many times and she thought he believed he was a big man waving the gun around.   All that is sufficient, in my view, to link the defendant's gun possession more likely than not to his drug trafficking and, in fact, however this is defined or however we analyze the evidence, the defendant's possession of the firearm that led to Mr. Methot's death was over a dispute about a drug sale.

The PSR and the exhibits, including the Facebook entries, also strongly suggest the defendant was still involved in sex trafficking as of September 2016 and I find his possession of the firearm was directly related to that as well and I'll apply the four level enhancement under section 2K2.1(B)(6)(b).

The sentencing findings are as follows:   The base offense level is 14 under section 2K2.1(A)(6)(a).   Because one of the firearms possessed was stolen, two levels are added bringing the offense level to 16.   Because the defendant used or possessed a firearm in connection with another felony offense, four levels are added bringing the offense level to

1    20.   The defendant has accepted responsibility for the

2    offense.   The offense is reduced three levels to 17.   The

3    defendant's criminal history category is Category IV.

4         For a total offense level of 17 and a criminal history

5    category of IV, the applicable guideline sentence range is 37

6    to 46 months.

7         The defendant is not eligible for probation.   Supervised

8    release is 1 to 3 years.   Fine range is from $10,000 to

9    $250,000.   The defendant does not have the ability to pay a

10   fine.   A special assessment of $100 is mandatory.

11        Other than the objections previously raised, does the

12   Government have any objection to those findings?

13             MS. MCELWEE:   No, Your Honor, other than I, just for

14   purposes of the record, Judge, could just make two comments.

15        I just want to make a note, in response to your

16   thoughtful analysis, I just want to indicate on the record

17   that another point the Court could look at in finding which

18   version to believe would be acknowledging the defendant's

19   acknowledgement that it was voluntary manslaughter as part of

20   the plea agreement.

21        That's in the prosecution version and his waiver of any

22   objection to the presentence report as written, and also just

23   to point out that in the defendant's exhibits under the report

24   of the State Medical Examiner at 77, the medical examiner

25   notes that the direction of the bullet that caused Mr.

1    Methot's death was downward, which would suggest to me that he

2    couldn't have been coming at him since he was taller than Mr.

3    Ortiz and Mr. Methot had to have been already lower than Mr.

4    Ortiz at the time of the shooting.

5        I just want to state that point on that issue.  I accept

6    your findings and I have no other objections.

7            THE COURT:  All right, thank you.  Mr. Rioux?

8            MR. RIOUX:  Your Honor, I don't have any objection

9    to the calculation.  I don't know if I should respond to the

10   point that Ms. McElwee raised, but the downward trajectory did

11   come up at trial.  There was significant cross-examination

12   about that.  It wasn't copied as a sentencing exhibit, and

13   there are certainly some questions to whether it was, in fact,

14   downward and whether that would be at all inconsistent with

15   what we offered as a defense.

16       I would argue it was completely consistent with the

17   defense.  I didn't think it was a particularly significant

18   issue at the trial, but that wasn't copied to the Court so

19   that's all.

20           THE COURT:  All right, thank you.  Counsel, would

21   you like to be heard on sentence?

22           MS. MCELWEE:  Yes, Judge.  As the Court is aware

23   from my most recent sentencing memorandum in the event that

24   you ruled as you have, the Government has moved for a variant

25   sentence above the advisory guideline range, which is now

1    determined to be 37 to 46 months.

2         Today, Judge, you will sentence Timothy Ortiz for his

3    illegal firearm possession in the fall of '16 in Biddeford,

4    Maine, and unlike many, if not all, because I, of course,

5    don't know every case you have handled in the U.S. District

6    Court in Maine, but certainly in terms of ones I'm aware of,

7    unlike many of the federal gun defendants all of them

8    sentenced in Maine, Mr. Ortiz's possession resulted in the

9    death of another human being, and today you will decide in

10   light of the section 3553(a) factors, that is those factors

11   which Congress has decided what is an appropriate sentence for

12   you to consider, what sentence is appropriate but not greater

13   than necessary to accomplish the enumerated goals of

14   sentencing, and I'd like to highlight some of those with the

15   Court now from the Government's perspective on those factors

16   for the benefit of the family of Jonathan Methot, who are

17   present.

18        First, the Court must consider the nature and

19   circumstances of the offense.  Mr. Ortiz, as reflected by the

20   presentence report and the Government's and defense exhibits

21   presented to you today, came to Maine in 2015 for the purpose

22   of selling illegal drugs.  While doing so, it became clear

23   that he, in making money for himself, exploited vulnerable

24   Mainers, individuals addicted to drugs at the start of what

25   would become an intense opioid crisis in this district, and

1    many of those addicts were women who, as the Court is all too

2    familiar, were in a dark place in their lives and had begun to

3    engage in prostitution.

4         At the time of his possession of the gun that is alleged

5    in the indictment, Mr. Ortiz had come from a very short, but

6    significant criminal history in New York and I'm just going to

7    dip into the history and characteristics of the defendant if

8    you'll indulge me.  It begins in New York at the age of 18 and

9    he starts off with possessing counterfeit bills as alleged in

10   Paragraph 31.

11        While he's at the jail where he met --

12            THE COURT:  It says 20.

13            MS. MCELWEE:  Excuse me, you're absolutely right.  I

14   misspoke.  At the age of 18, as reflected in Paragraph 36,

15   he's alleged to have physically assaulted two victims and

16   forcibly stolen their phones.

17        Then at the age of 20, he possesses the counterfeit

18   bills as reflected in Paragraph 31, you are correct.  Those

19   allegations in Paragraph 36 are non-convictions, Judge.

20            THE COURT:  Right.  And there's a -- I'm not sure

21   what the 1st Circuit wants me to do with --

22            MS. MCELWEE:  Right.

23            THE COURT:  -- that.

24            MS. MCELWEE:  That's why I used the word alleged,

25   because he was not convicted of that conduct.

1          THE COURT:  I think the -- it's really hard to

2     understand where we are on that in the 1st Circuit.

3          We have a very strong case, which I cited before, the

4     Marrero case, which says we cannot use an arrest for any

5     purposes under -- for sentencing purposes.

6          We then have the subsequent case by Judge Lynch that

7     says we can use it, but only if there's outside evidence that

8     supports the facts underlying the arrest.

9          I think for our purposes here today, it's not going to

10    make much of a difference and I think it's probably better

11    that we do not consider Page 16.  I have -- 18, arrest.  This

12    was in the Bronx and the disposition says no disposition

13    listed, so I think it's probably wiser not to consider that.

14          MS. MCELWEE:  Okay.  At the age of 20 we have the

15    incident in Paragraph 31 with the counterfeit bills.  It

16    resulted in a six-month jail sentence because it was lumped in

17    at a dispositional phase at Paragraph 32 where the defendant

18    bail jumped and failed to appear in court.  While he's in the

19    House of Corrections, he begins what I would characterize as a

20    bit of a thread that takes us all of the way to the night of

21    Jonathan Methot's killing and, that is, Mr. Ortiz's mouth

22    getting him into trouble.

23          He's at the House of Corrections and he is being

24    disciplined for something relatively minor.  They're taking a

25    prohibited piece of clothing from him and he says you're a

1    fucking bogo, this is fucking shit, suck my dick.  That's

2    where he starts.  That's kind of his baseline.

3         At the age of 21 with that somewhat limited history, but

4    still so young, he comes to Maine to sell drugs and he's

5    alleged to be engaged in sex trafficking that he's later

6    convicted of as reflected in Paragraph 33, if I have my

7    numbers right.

8              THE COURT:  Right.

9              MS. MCELWEE:  And then that becomes his predicate

10   felony for our offense, and the Court can read that paragraph,

11   that it involves him taking advantage of young female addicts

12   as I described previously who he is pimping out in a hotel

13   room with drug paraphernalia to include tourniquets,

14   hypodermic needles, digital scales and a box of unused plastic

15   baggies and the young women tell the police when he arrives

16   that he has forced them into prostitution for exchange of

17   drugs, been supplying her with heroin for approximately 1 week

18   to keep her addicted so she can work as a prostitute.

19        During that offense, a firearm with an obliterated

20   serial number is found in the defendant's possession and that

21   still today sits in the Portland Police Department in their

22   evidence locker.

23        Mr. Ortiz was not yet a felon and so he arguably was not

24   prohibited from possessing that gun by any federal statute,

25   other than in accordance with his alleged and then later

1    convicted aggravated sex trafficking and unlawful furnishing

2    scheduled drugs.

3           THE COURT:  This is consistent, by the way, with the

4    Facebook posting that you introduced into evidence and the

5    Facebook posting -- I'm talking here about use of drugs to

6    keep women -- or start women or keep women involved in

7    prostitution and says if I were to get my hands on her, she

8    will be a victim.

9           MS. MCELWEE:  That's absolutely correct and that's

10   the post that he posts on --

11          THE COURT:  August 7th, 2017.

12          MS. MCELWEE:  That's correct, Judge.  Same summer.

13   So he is convicted of that.  He is given one year in jail to

14   serve, a thousand dollar fine and three years of probation and

15   then transferred his probation to New York where he returns

16   presumably to live with his friends and family.

17          And just a summer later after he serves that sentence,

18   he returns to Maine in violation of his probation where he

19   absconds and promptly just gets right back to it at the drug

20   house at West Cutts Street in Biddeford where he now is in

21   possession of two guns, one being an AR 15 and a ballistic

22   vest that you see in the Facebook post where he makes

23   reference to continuing to feed people addiction -- addicted,

24   the drugs to which they're addicted and makes reference -- or

25   maybe what I would characterize as jokes about domestic

1   violence.

2        He himself identifies his home, the home in which Mr.

3   Methot died, as his trap and jokes about his being ready for

4   war and who looks to smoke and then we, of course, know what

5   happens on September 25th into the 26th at that same home,

6   which results in Mr. Methot's death.  And I know I argued in

7   my memo, because obviously that's much more significant now in

8   light of the fact that you find that Mr. Ortiz may have been

9   acting in self-defense, but that we hadn't proven voluntary

10  manslaughter, even if he was acting in self-defense we are

11  still talking about a firearm possession in violation of

12  federal law that looks nothing like those which we see

13  typically here.

14       If we're looking at a spectrum, if we're looking at the

15  history and characteristics of this defendant, the nature and

16  circumstances of the offense and the need to avoid unwarranted

17  sentencing disparities, a third factor, we have the spectrum

18  of perhaps a hunter benignly using a gun to take it hunting

19  when he is a felon.

20            THE COURT:  Yeah, but that's including -- some of

21  that is included in the enhancement.  You've got the stolen

22  firearm.

23            MS. MCELWEE:  It absolutely is.

24            THE COURT:  And you've got possession of the firearm

25  in connection with another felony, so they are both enhanced.

1    If he had just been what you're describing, he would be far

2    lower in terms of guidelines.

3           MS. MCELWEE:  That's correct.  But I do think that

4    given that the four level enhancement addresses only the drug

5    trafficking and not the fact that he was engaged in the -- I

6    think it's more the climate of his possession that disturbs me

7    most that puts it outside the guidelines for my purposes, is

8    that you don't have someone -- and I don't want to use the

9    word innocently -- but benign possession just versus what Otis

10   said, he was reckless, thought he was invincible.  Hanging out

11   in a trap house with a gun that he isn't even suppose to look

12   at and have with him, that he's flipping and playing with,

13   that he had on him at the time where they have this dispute

14   over a $40 drug debt that results in someone's death.

15          And so if you're looking at the need for just

16   punishment, that is, addressing Mr. Ortiz's possession of a

17   gun he shouldn't have even had, with this significant -- I

18   mean criminal history IV, I'm not sure -- I'm not sure puts it

19   in the right light because he's on probation -- and you get

20   points for being on probation -- but it's sending the message

21   to this man the need to protect the public from Mr. Ortiz from

22   further crimes and the respect for the law that Mr. Ortiz's

23   PSR reflects he doesn't have at all.  I would ask the Court to

24   still impose a sentence that the Government recommended of

25   115 months.

1          THE COURT:  Thank you very much.  Mr. Rioux.

2          MR. RIOUX:  Thank you, Your Honor.  Your Honor, this

3  is a very difficult case.  Hanging over us all, I think, is

4  the death of Mr. Methot and the tragedy that that is; whether

5  we call it self-defense, manslaughter, recklessness or an

6  accident.  It is a real tragedy that cannot be undone and that

7  must be acknowledged.

8          But at the same time, I think the Court needs to

9  recognize the import of imposing a sentence that is in line

10  with the factors that the Sentencing Commission recognized and

11  that recognize the seriousness of his conduct, but to resist

12  the temptation to impose a sentence for another offense or for

13  characteristics of this offense which were not proved or were

14  questionable.

15          We're asking the Court to impose a sentence that is at

16  the low-end of the applicable guideline range.  We have

17  recommended that guideline range to be a different range and I

18  think the same arguments would apply.

19          Mr. Ortiz, as the presentence report points out, has a

20  troubled past and brings with him to this day the significant

21  baggage of a very difficult childhood, brought up in an area

22  of high crime and violence where he witnessed violence,

23  witnessed death, was surrounded by criminality.

24          He grew up without the benefit of substantial

25  significant parenting by his biological parents in some

1    respect, and his father has not been --

2          THE COURT:  I thought his mother was quite involved

3    in his -- in the presentence report the father was not, but

4    the mother was very involved.  He had -- he had an aunt who

5    was very close to him.

6          MR. RIOUX:  That's right.

7          THE COURT:  That he relied on and then there was the

8    paternal grandmother who owned restaurants and he worked in

9    restaurants.

10         MR. RIOUX:  Yes, sir.

11         THE COURT:  I have -- there are some people who live

12   in a tough area and it's bleak, but I didn't see that with

13   him.  I thought that his -- it sounded like he came from a

14   good family, a hardworking family.

15         MR. RIOUX:  Yes, Your Honor.

16         THE COURT:  And it sounded to me like -- and so

17   going the way of his grandparents and working in the

18   restaurant and discipline in his life, he decided to go for

19   the street.

20         MR. RIOUX:  Yes, Your Honor.  Your Honor, he did

21   have some strong environment and family who is still

22   supportive of him today and is here to support him --

23         THE COURT:  Right.

24         MR. RIOUX:  -- at great effort and expense to them.

25   His aunt was a very important figure in his life, who recently

1    passed away during his incarceration, and she was one of the

2    large parental figures in his life and he was lucky to have.

3        So I don't mean to say that he was homeless or had no

4    support, but he did --

5        THE COURT:  You didn't.  He was -- I guess his

6    mother had a boyfriend who wasn't very nice to him, but

7    there's no indication of any abuse.

8        MR. RIOUX:  Yes, Your Honor.  That's true.  He was

9    not -- no history of -- some people who do come before this

10   Court, as far as violence and physical and sexual abuse,

11   nothing like that.  But -- and many people under worse

12   circumstances will grow up to do much better and some people

13   under right circumstances may end up doing worse.  So it's

14   certainly tough to draw a correlation.

15       I certainly don't mean to excuse the conduct based on

16   that, but as many who come before him, he has, as the Court

17   points out, sort of taken a wrong path.  Could have gone the

18   way of his industrious grandmother.

19       THE COURT:  His mother was working at a clothing

20   store, manager of a clothing store in Florida.

21       MR. RIOUX:  Yes, Your Honor.  And certainly he is,

22   as this Court can well see, had a much more misguided path.

23   But what we do see is that -- before this Court is a man who

24   has been locked up, for some years been in custody.  He is a

25   young man still, about to be 26 years old, and he's a man who

1    has the potential for a good future, potential for a good life

2    with the help of his family who is going to be there to

3    support him.

4          He has in, I would say, a recent year and a half or so

5    made some good progress in my experience with him.  His

6    experience in the correctional system in Strafford County

7    where he's held, where he's done much better than in

8    Cumberland County or the York County Jail.

9          He's a man who is intelligent, who is reasonably

10   articulate, who has goals and aspirations and who acknowledges

11   that he's made horrific mistakes, and the worse of them being

12   the incident of September 26th that led to the death of Mr.

13   Methot.

14         What we're asking the Court for is for Mr. Ortiz to have

15   a chance at success.  I think that probation supervision this

16   Court will impose is going to be essential in that respect.  I

17   note -- and we discussed the special conditions that will

18   include the Job Corp training program, to do community service

19   work if not employed, things of this nature, these are going

20   to be essential -- the workforce development program, not the

21   Job Corp, but work force development program.  He's a man who

22   has had some success working in the restaurant industry with

23   family and things of that nature and can find that success

24   again.

25         The disrespect -- the language that we see in the

1    Facebook post, the language that sort of came into the trial

2    is very troubling, but it's also indicative of, how you say,

3    the street sort of life that he has been out of for years now

4    and can make a clean break upon his release.

5        He's clearly got a significant sentence to serve no

6    matter what this Court does and I think he has good prospects

7    for success.

8        I'd like to present to the Court the individuals -- they

9    don't have a specific verbal address for the Court, but I

10   would like to introduce the Court to several people here.

11   Shyla, who is on the Court's right, a long time friend of Mr.

12   Ortiz is in the court.  Nancy Canter is here to support, as

13   well a friend of Mr. Ortiz for some years.  Marquis Lyon, he

14   has been a childhood friend of Mr. Ortiz who traveled from New

15   York to attend these proceedings.  His grandmother Josephine

16   in the back there, Your Honor, traveled from New York and his

17   mother Myrna is here as well.  She traveled from Florida, Your

18   Honor.

19       He's got a lot more support than a lot of folks in this

20   situation.  I, for one, suggest the Court should take that as

21   hope and optimism.  We wish he had done more with that support

22   before he arrived in this courtroom.  Then at this point all

23   we can do is hope that he will do that in the future.  We

24   can't change what happened and he knows he has to pay a price

25   for it, but what I suggest is that you give him a reason for

1    hope.   Thank you.

2          THE COURT:   Thank you.   Mr. Ortiz, as the defendant

3    before the Court for determination and imposition of sentence,

4    you have a constitutional right to address the Court at this

5    time.   Do you have anything you wish to say to me, sir?   Stay

6    right there.   Stay right there.

7          THE DEFENDANT:   I just want to say I'm sorry for the

8    losses that was taken and it was never meant to be that way

9    and I didn't think that was going to happen and that if I

10   could do it all over again, I wouldn't do it the same way.

11   I've got plans when I do get out and I'm trying to change my

12   life around.

13         THE COURT:   What are your plans?

14         THE DEFENDANT:   I want to start a business.

15         THE COURT:   What business?

16         THE DEFENDANT:   I'm thinking about starting a

17   business with my grandmother, try to get a restaurant going or

18   something, you know what I mean?   I mean I've been thinking

19   about it for three years now and I think that's the right -- I

20   got -- I know -- I've been around it so long that I know -- I

21   got experience with it so that's what -- where I plan to go.

22         THE COURT:   All right.   Anything further, Mr. Rioux?

23         MR. RIOUX:   Your Honor, I would note that because of

24   the strange history of this case, he has been in custody for

25   some time.   Much of that time does not apply to this case.   He

1     came into federal custody approximately a year and some

2     months -- June?

3              MS. MCELWEE:  14 months ago.

4              MR. RIOUX:  14 months ago and so some of that

5     pre-detention time is not applied to this case.

6              THE COURT:  Right.  Anything further?

7              MS. MCELWEE:  Just on that point, Your Honor, all of

8     the time, except for the 14 months, was credited to state

9     issues and time he owed the state of Maine for the violations,

10    but he will get credit for the 14 months in federal custody

11    and with that in mind, even with the sentence the Government's

12    proposing, Mr. Ortiz would be out at the age of 32.

13         May I have just a moment to check and see if anyone else

14    has something to say?

15             THE COURT:  Sure, yes.

16             MS. MCELWEE:  Just one more thing, I didn't see this

17    in my notes.  Mr. Ortiz, after the incident in Biddeford, had,

18    while incarcerated at two jails before coming into federal

19    custody, an unusually large amounts of incidents, 35 incidents

20    at the jail, which are described in the presentence report

21    which I would suggest continue the same type of behavior that

22    we see in his time leading up to that and I didn't mention

23    that.  Thank you, Judge.

24             THE COURT:  All right.  Thank you.  The Court has

25    carefully reviewed the contents of the written presentence

1    investigation report and takes those contents into account in

2    determining sentence.  The Court has considered what it has

3    heard from counsel in the course of these proceedings, at the

4    presentence report conference, the evidence at this hearing,

5    including the allocution of this defendant.

6        The Court has already made its guideline calculations.

7    I have taken into consideration each of the factors set forth

8    in 18 USC section 3553(a), including the obligation to impose

9    a sentence that is sufficient but no greater than necessary to

10   achieve the purposes of the law.

11       Although I've considered each statutory factor, I

12   focused on the history and characteristics of the defendant,

13   the nature and circumstances of the offense and the need to

14   protect the public from future crimes of the defendant.

15       I have started with a guideline sentence range of 36 to

16   47 months, which is advisory.

17       Turning to the history and characteristics of the

18   defendant, the defendant is a 25-year old native of New York

19   City.  The defendant's father, José Cruz, and his mother,

20   Myrna Ortiz, were not married at his birth and the defendant's

21   father left when he was about nine years old.

22       The defendant's father now lives in Texas and is not

23   involved in the defendant's life.  The defendant says his

24   father has had a drug problem.  Defendant's mother, who is

25   present in the courtroom today, now lives in Holiday, Florida

1    and she is the manager of a phone store there.  The defendant

2    has two younger maternal half-brothers.  One serves in the

3    United States Army and the other is in school.  He has three

4    paternal half siblings, two in Pennsylvania and one an infant

5    in Texas.

6         The defendant was raised in the Bronx.  He says that his

7    mother took good care of him.  His aunt, as I mentioned, Lisa

8    Valasquez, helped out when his mother was working and his

9    paternal grandparents, one who is here today, owned

10   restaurants in the Bronx where the defendant himself worked.

11   He continues to stay in touch with his paternal grandmother,

12   Josephine DellaSantos, who is here today.

13        The defendant denies being subject to any physical abuse

14   while growing up.  He recalls his mother had a long-term

15   boyfriend who was verbally abusive to him, but the boyfriend

16   is no longer with his mother.  The defendant says he was

17   brought up in a difficult neighborhood with drugs, violence

18   and crime.  It says he was jumped numerous times in the street

19   and at one point he was stabbed in the elbow and another time

20   cut.

21        He says he witnessed stabbings, shootings and two of his

22   friends being murdered, one stabbed in the heart and the other

23   shot in the stomach.  Except for six months in Pennsylvania

24   with his father and six months in Florida with his mother,

25   he's always lived in the Bronx.

1           The presentence report says he had been staying in Maine

2     for about a month before the incident which brings him to

3     court today.  The defendant attended Theodore Roosevelt High

4     School in the Bronx through the 10th grade.  At one point he

5     was transferred to a group home and attended Bronx Group

6     Preparatory Academy in the Bronx.  He does not have a GED, but

7     he is interested in obtaining one.

8           He has no physical problems relevant to sentencing,

9     except his vision issues.  The presentence report says the

10    defendant suffers from myopia, nearsightedness, and his vision

11    uncorrected is 20/800.  I understand that 20/20 vision means

12    that the person sees at 20 feet what a person with normal

13    vision sees at 20 feet, but if he's 20/800, he needs to be

14    20 feet away from an object to see what a normal person sees

15    at 800 feet.

16          In fact, under Maine law, a person is considered blind

17    if he has 20/200 vision, if not corrected.  That's found in 26

18    MRS, section 1418(1).

19          I see the defendant in glasses in court today and

20    hopefully his vision has been corrected, but at the time that

21    he was involved in this tragedy, he had a very significant

22    problem with myopia and nearsightedness and when you think of

23    all the evidence that he was possessing and waving around

24    guns, it gives you pause.

25          The defendant has a mental health history as young as

1    six years old when he was diagnosed with ADHD and he would

2    throw tantrums at school.  He received special education and

3    medication to manage this issue.  At one point he attended

4    Four Winds Psychiatric Health Facility in New York State.

5          After his 2014 incarceration, the defendant was

6    diagnosed with depression and prescribed mood stabilizers,

7    Prozac and Remeron.  There was also a suggestion of alcohol

8    abuse disorder, adjustment disorder and disturbance conduct,

9    antisocial personality disorder and substance abuse disorder.

10         He was prescribed some medicine at the Somerset County

11   jail, but for reasons that were disputed, he was not taking

12   them.  He has a substance abuse history.  He began smoking

13   marijuana at age 14 and he used marijuana every day, multiple

14   times per day, until his arrest.

15         At age 20, he began drinking alcohol and there were

16   periods of heavy drinking.  He used Ecstasy on an experimental

17   basis, but there's no evidence that the defendant abused

18   heroin or crack cocaine, two of the drugs that he was dealing

19   in Maine.  He has not undergone any drug treatment, but he is

20   interested in doing so.

21         The defendant has been incarcerated for most of time

22   since 2015.  Before that, he worked at his grandparents' Bronx

23   restaurants and in Job Corp.  The defendant has never married,

24   he has no children.  He does have a long-term girlfriend who

25   lives in the Bronx with her two children.

1          He has a criminal history and I'm going to take a moment

2     to describe it.  His first conviction took place in New

3     Rochelle, New York, after he was arrested in December of 2013

4     for possessing forged $20 bills.  He was arrested on

5     December 10, 2013, and was released on bail, but he failed to

6     appear for his hearing in April -- on April 24, 2014.  He was

7     then arrested on March 6, 2015, and was charged with bail

8     jumping.

9          On March 30, 2015, he was sentenced both for the

10    possession of a forged instrument and for the bail jumping

11    charge.  He was given a six-month sentence on March 30, 2015.

12    These sentences to run concurrently.

13         Given the fact that he was sentenced to six months on

14    March 30, 2015, it is surprising he was arrested in Maine on

15    August 26, 2015, for new criminal conduct, since it would seem

16    to fall within the period he should have been incarcerated,

17    but these sentences are often less than meets the eye.

18         In any event, on August 26, 2015, local police were

19    conducting surveillance at a local hotel where they suspected

20    prostitution was taking place.  The police observed two

21    females with a person later identified as the defendant.  The

22    police carried out a sting operation and the female who was

23    acting as a prostitute identified Tye as having forced her

24    into prostitution in exchange for drugs.  Tye turned out to be

25    the defendant.

1          The female also said the defendant had been supplying

2     her heroin for about a week to keep her addicted so that she

3     would work as a prostitute.  Finally, she said the defendant

4     had threatened her with a dark colored Smith & Wesson

5     revolver.

6          The defendant was arrested on August 26, 2015, and

7     charged with aggravated sex trafficking and unlawful

8     furnishing a scheduled drug.  On February 5, 2016, the

9     defendant was sentenced in state court to both crimes.  A

10    four-year period of incarceration was imposed, but all but one

11    year was suspended and the defendant was sentenced to three

12    years of probation to follow.

13         According to the presentence report, the defendant was

14    released from custody in Maine on July 29, 2016.  His

15    probation was immediately transferred to Brooklyn, New York.

16    The defendant initially reported to probation in New York and

17    then failed to report on subsequent occasions.  A warrant was

18    issued again for being a probation absconder.

19         He was next arrested in Maine on September 26, 2016, and

20    charged with murder.  The presentence report says that while

21    awaiting trial on a murder charge, the defendant was charged

22    with a violation of probation and that on November 18, 2016,

23    he was sentenced to nine months incarceration and his

24    probation was continued for three years, but he was later

25    sentenced to another nine months to run consecutive to the

1    November 18, 2016, sentence and he finished serving that

2    sentence in March of 2018.

3        Meanwhile, on June 25, 2018, the defendant was found not

4    guilty of murder and manslaughter by a Maine jury.  On

5    June 27, 2018, a federal criminal complaint was issued against

6    the defendant for being a felon in possession and on the same

7    day he went into federal custody.

8        The defendant, as has been noted, has a criminal history

9    Category IV.  The defendant's criminal history score was

10   increased two levels because at the time of his federal

11   sentence under the criminal justice sentence for the

12   aggravated sex trafficking and unlawful furnishing

13   convictions.

14       Turning to the nature and circumstances of the offense,

15   I've already described in detail the circumstances provided by

16   the Government to conclude that the defendant had possessed a

17   Ruger New Model Black Hawk on September 25-26, 2016.  As I

18   mentioned earlier, the defendant had been convicted of two

19   felonies, aggravated sex trafficking and unlawful furnishing

20   scheduled drugs, on February 5, 2016, and he was sentenced to

21   four years in prison with all but one year suspended to be

22   served concurrently.

23       On February 5, 2016, onward, there was a violation of

24   federal criminal law for the defendant to possess a firearm.

25   The defendant was released from incarceration on these

1  sentences on July 29, 2016.  He was immediately transferred to

2  Brooklyn and initially checked in with the probation officer

3  in New York.

4       So we know that he was in New York City in late July to

5  early August 2016, but that he absconded.  We also know from

6  Kristalyn Talmer's testimony that after she moved out of West

7  Cutts Street, she went there to buy drugs from the defendant

8  and she said that one week before the shooting, the defendant

9  had the gun out and was waving it around West Cutts Street.

10       We also know the defendant showed Brittany Cox a

11  revolver when they were at the Westbrook apartment before they

12  went to West Cutts Street and in the prosecution version that

13  the defendant admitted today in terms of he drew a Ruger 357

14  revolver and brandished the revolver and ended up shooting

15  Jonathan Methot on September 26, 2017.

16       The presentence report mentions another firearm, which

17  is an AR 15 rifle, which the police found at the Westbrook

18  apartment.  The renter of the apartment denied knowledge of

19  this firearm and it was a Ruger, and it turned out the AR 15

20  had been stolen by the owner's brother to pay for drugs.  It

21  had distinctive markings and a witness confirmed defendant

22  possessed that AR 15 at West Cutts Street.

23       The need to protect the public is obvious.  That if the

24  defendant continues his criminal lifestyle, he's bound to

25  commit further crimes that harm the public.

1          I have taken into consideration a number of factors in

2     this case.  Specifically, I've taken into account the nature

3     of the firearms.  Here, we have a Ruger 357 Black Hawk, which

4     is a common highly lethal pistol, and the other firearm is an

5     AR 15.  That's a semi-automatic lightweight rifle.  A very

6     lethal weapon.

7          I've considered the fact that one of the firearms,

8     namely the AR 15, had been stolen and been traded for drugs

9     and ended up in the defendant's possession.

10          I've considered the defendant's criminology.  He spent

11     most of his life in New York.  I spent a while describing his

12     criminology because I find it disturbing.  On March 6, 2015,

13     he was arrested for bail jumping and brought to court in New

14     Rochelle, New York, and on March 30, 2015, he was sentenced to

15     six months incarceration in New York for the bail jumping and

16     forged instrument charges.

17          As I mentioned, if he had spent the full six months in

18     jail, he would not have been in Maine on August 26, 2015, when

19     he was arrested for aggravated sex trafficking and unlawful

20     furnishing.

21          Then he's sentenced to one year incarceration and on

22     those two charges he's released on July 29, 2016, and traveled

23     directly to New York City.  By September 25-26, the defendant

24     however was back in Maine and the evidence is he's been in

25     Maine for a while dealing drugs and probably involved again in

1    sex trafficking.

2         I mentioned all this because the defendant came to the

3    attention of law enforcement in Maine as a result of their

4    investigation of a gang in the Bronx called the Mack Baller

5    Bloods.  This gang had been trafficking heroin, crack and

6    women in Maine.

7         I would point out there's no direct evidence that the

8    defendant is involved with the Mack Dollar Bloods, but it

9    seems unrefutable that the defendant walked into an existing

10   drug distribution and sex trafficking network when he came to

11   Maine.  And the timing, his lack of steady employment, his

12   trafficking in heroin and crack, his trafficking in women and

13   his general MO is consistent with that kind of membership, but

14   I find it too speculative to come to conclusions about gang

15   membership and I haven't held that against the defendant and I

16   haven't used it to enhance his sentence because I find it too

17   speculative.

18        I have considered his possession of a firearm that led

19   to the death of Jonathan Methot over an argument involving $40

20   in drugs, and I've also considered the defendant's willingness

21   to plead guilty and accept responsibility for the offense,

22   thereby allowing the Government to avoid the expense and the

23   time and difficulty with a trial.  I've considered all these

24   factors in attempting to arrive at a sentence, to impose a

25   fine and payment of restitution.

1    Mr. Ortiz, I'm going to speak to you for a brief moment

2   and as I do, I'm going to tell you what sentence I'm going to

3   impose and then I will ask you to stand for the imposition of

4   sentence.

5    Mr. Ortiz, you're a young man, but your life is not

6   going in the right direction.  Over the past four years,

7   you've spent a lot of time in jail, but in the time you

8   haven't been in jail, you've been convicted of sex

9   trafficking, drug furnishing, and now a weapons violation.

10    You received, in my view, an extraordinarily lenient

11   sentence of one year incarceration for sex trafficking and

12   drug furnishing, and it was apparent that the lenient sentence

13   that was imposed by the state judge did not deter your

14   continued conduct.  As soon as you could, you returned to

15   Maine and started sex trafficking and drug trafficking

16   immediately.

17    This has to stop, Mr. Ortiz.  Just reflect on the fact

18   that you were charged with and acquitted of murder.  Consider

19   the fact that the gun that you possessed that day you

20   shouldn't have possessed at all.  Consider the fact that if

21   you had obeyed the law, Jonathan Methot would not be dead and

22   his family would not be here watching your sentencing.

23    You say, and I take you at your word, that you're sorry

24   that you shot and killed Jonathan Methot.  It would take a

25   cold-hearted person not to say that, but I take you at your

1   word, but the fact of the matter was you were hanging around a

2   trap house.  You were carrying a firearm into a trap house.

3   The firearm was loaded.  You didn't have to load that gun.

4   You don't bring a loaded firearm to a trap house unless you

5   intend to use it, and you knew that you were going to be

6   dealing with people who were addicted to drugs and you knew

7   all that that entails.

8        You also knew, because I've read your Facebook page,

9   that you have a hair trigger temper.  You've had a temper ever

10  since you were a little boy, and you find it hard to control

11  yourself and you get into a tantrum and it's pretty obvious

12  why you had the gun.  You had the gun because drug dealing,

13  sex trafficking and doing that kind of criminal behavior is

14  inherently dangerous.

15       Someone comes in and tries to take the money or the

16  drugs, they can't call the police so you've got to protect

17  yourself and you've got to protect the money.

18       I read your Facebook posting and it's apparent that you

19  were into the culture.  You say on your Facebook page you were

20  young, untouchable, money maker, yumm, Y-U-M-M.

21       Now, Mr. Ortiz, you're not quite as young as you used to

22  be.  You are certainly, as you found out, not untouchable and

23  may I suggest that you need to find ways of making money that

24  do not hurt other people.

25       I look at your family here today and I don't know how

1    you fell so far from the church.  Look at your family.  They

2    came up all of the way from Florida and New York City.

3    They're hardworking people.  They're business people.  They

4    strike me, looking at them, as good people and I'm going to

5    suggest to you that it's time that you began -- begin to grow

6    up and become the person, the son, the grandson you were

7    raised to be.

8         I'm also going to suggest to you the following and, that

9    is, when you get out of prison, you're going to be on

10   supervised release and you can treat that in two ways.  You

11   can treat it the way you treated some of the corrections

12   officers and you can wrangle against it and you can swear at

13   them and you cannot attend meetings and you can do it your own

14   way.  And what you will do is you will provoke the law

15   enforcement side of the probation officer and you'll end up

16   back in jail.  Or you can use them as a social worker and you

17   can reorder your life and you can say, you know, I'm not going

18   to hurt another woman.  I'm not going to feed another

19   addiction.  I'm not going to kill another man.

20        But I will tell you this, Mr. Ortiz, if you go back and

21   do what you did in the past in the future, you are going to

22   find a judge saying that you are incorrigible and there's no

23   hope.  You've got one last chance.

24        I'm going to impose the $100 special assessment.  I'm

25   going to impose three years of supervised release.  I'm going

1    to impose conditions on that supervised release so you'll stop

2    violating the law and you'll go back to work.

3          I'm not going to fine you because it seems to me that if

4    you are working, you ought to gain the benefit of your labor.

5    In terms of the sentence, I'm going to impose -- you face a

6    guideline sentence range of 37 to 46 months.  The Government

7    has urged me to impose a sentence of 115 months.  Under the

8    plea agreement, your lawyer has urged me to impose a sentence

9    of 92 months.  I am accepting your lawyer's earlier

10   recommendation and imposing a sentence of 92 months.  You'll

11   stand for the imposition of sentence.

12         The defendant is hereby committed to the custody of the

13   United States Bureau of Prisons to be imprisoned for a total

14   term of 92 months.  The Court recommends the defendant for

15   enrollment in the 500-hour comprehensive drug treatment

16   program.

17         The defendant is remanded to the custody of the United

18   States Marshal.  Upon release from imprisonment, the defendant

19   shall be on supervised release for a term of three years.  The

20   Court imposes the following mandatory conditions:  You must

21   not commit another federal, state or local crime.  You must

22   not unlawfully possess a controlled substance.  You must

23   refrain from the unlawful use of a controlled substance.  You

24   must submit to one drug test within 15 days of release from

25   imprisonment and at least two additional drug tests during the

term of supervision, but not more than 120 drug tests per year thereafter as directed by the probation officer.

You must cooperate in the collection of DNA as directed by the probation officer.  You must comply with the standard conditions that have been adopted by this Court, as well as any other conditions.

You shall comply with the following special conditions: The defendant shall participate in workforce development programs and services as directed by the supervising officer and, if not employed, shall perform up to 20 hours of community service per week.

Workforce development programming may include assessment and testing, educational instruction, training classes, career guidance and job search and retention services.

The defendant shall not use or possess any controlled substance, alcohol or other intoxicant and shall participate in a program of drug and alcohol abuse therapy to the supervising officer's satisfaction.  The defendant shall pay or co-pay for services during such treatment to the supervising officer's satisfaction.

The defendant shall not obstruct or tamper or try to obstruct or tamper in any way with any tests.

3.  The United States probation officer may conduct a search of the defendant and of anything the defendant owns, uses or possesses if the officer reasonably suspects that the

defendant has violated a condition of supervised release and reasonably suspects that evidence of the violation would be found in the areas to be searched.  Searches must be conducted at a reasonable time and in a reasonable manner.  Failure to submit to a search may be grounds for revocation of release.

4.  The defendant shall not own or possess any firearm or other dangerous weapon or knowingly be at any time in the company of anyone known by him to possess a firearm or other dangerous weapon;

And 5.  The defendant shall participate in mental health treatment, to include anger management, as directed by the supervising officer until released from the program by the supervising officer.  The defendant shall pay or co-pay for services during such treatment to the supervising officer's satisfaction.

The Court imposes a criminal monetary penalty in the amount of $100 on Count 1.  The Court finds the defendant does not have the ability to pay a fine.  The Court will waive the fine in this case.  Payment of the criminal monetary penalty shall be due in full immediately.  Any amount the defendant is unable to pay now is due and payable during the term of incarceration.  Upon release from incarceration, any remaining balance shall be paid in monthly installments to be initially determined in an amount of the supervising officer.  Said payments are to be made during the period of supervised

1        release, subject always to review by the sentencing judge on

2        the request by either the defendant or the Government.

3              Is there any objection to the terms of supervised

4        release on the part of the defendant?

5                    MR. RIOUX:  No, Your Honor.

6                    THE COURT:  On the part of the Government?

7                    MS. MCELWEE:  No, Your Honor.

8                    THE COURT:  Mr. Ortiz, I must advise you of your

9        right to appeal.  You've entered into a plea agreement as you

10       know.  The plea agreement provides that you have waived the

11       right to appeal your guilty plea and any other aspect of your

12       conviction and the sentence of imprisonment that does not

13       exceed 115 months.

14             The sentence I imposed is below 115 months and therefore

15       you waived your right to appeal your guilty plea, your

16       conviction and the sentence I just imposed; do you understand?

17                   THE DEFENDANT:  Yes.

18                   THE COURT:  These agreements are usually upheld as a

19       matter of law.  If for any reason you believe that your

20       agreement is unenforceable and you wish to present that

21       argument to the Court of Appeals by way of appeal, you must

22       cause to be filed with the clerk of this court, within 14 days

23       of today, a written notice of appeal; do you understand?

24                   THE DEFENDANT:  Yes.

25                   THE COURT:  I advise you if you fail to timely file

1    the written notice of appeal, you've given up your right to

2    appeal the sentence or the right to challenge the

3    effectiveness of the waiver of your right to appeal the

4    sentence and conviction; do you understand?

5                THE DEFENDANT:  Yes.

6                THE COURT:  If you cannot afford to file the appeal,

7    you can appeal without cost to you and on your request, the

8    clerk will immediately prepare and file a notice of appeal on

9    your behalf; do you understand?

10               THE DEFENDANT:  Yes.

11               THE COURT:  You may be seated.  Does the Government

12   have a motion on the indictment?

13               MS. MCELWEE:  Yes, Your Honor.  At this time the

14   Government orally moves to dismiss the indictment in this

15   case.

16               THE COURT:  Is there any objection?

17               MR. RIOUX:  No, Your Honor.

18               THE COURT:  On motion by the Government and without

19   objection on the part of the defendant, the Court hereby

20   dismisses the indictment in this matter.

21          Is there anything further from the Government?

22               MS. MCELWEE:  No.  Thank you, Your Honor.

23               THE COURT:  Anything further from the defendant?

24               MR. RIOUX:  Your Honor, we would ask that the Court

25   make a recommendation for placement to be as close as possible

1   to his family in the New York City area or to a facility

2   reasonably close if that may be possible.

3           THE COURT:  Sure.  Court recommends to the Bureau of

4   Prisons, if possible, the defendant be allowed to serve his

5   sentence at a place as close to New York City as possible,

6   specifically including Fort Dix.

7       Is there anything further from the defendant?

8           MR. RIOUX:  Nothing from us.

9           THE COURT:  I have just a couple of final

10  statements.  First, I want to speak to Mr. Ortiz's family.  I

11  want you to know I find it hard to sentence a young man like

12  Mr. Ortiz to such a long period of incarceration.  It's not

13  easy and I didn't do it because I felt any sense of revenge or

14  anything.  I did it because I felt I had to.

15      I'm very impressed with the fact you're here because it

16  signals to me that he will have your support and will have the

17  support not only while he's in prison, but also when he gets

18  out.  You've sent a wonderful signal to him by being here

19  today and I appreciate that.

20      I want to talk to the family, if they're still here, of

21  Mr. Methot.  It's a terrible tragedy.  I'm so sorry that you

22  lost Jonathan.  What struck me is that I know he had troubles,

23  but two of the women who were presented in this hearing had

24  troubles too and they both said they recovered and they have a

25  good life and because of what happened, Jonathan was robbed of

1    the ability to change.

2         So I'm terribly sorry and I hope that this process

3    ultimately will give you a sense that justice was done.

4         Anything further from the Government?

5              MS. MCELWEE:  Thank you.  No, Your Honor.

6              THE COURT:  Anything further from the defendant?

7              MR. RIOUX:  No.  Thank you.

8              THE COURT:  The defendant is hereby remanded to the

9    custody of the United States Marshal for the District of Maine

10   in execution of the sentence imposed.  Good luck, Mr. Ortiz.

11   Court will stand in recess.

12                       (End of proceeding)

13                   **C E R T I F I C A T I O N**

14   I, Dennis Ford, Official Court Reporter for the United States

15   District Court, District of Maine, certify that the foregoing

16   is a correct transcript from the record of proceedings in the

17   above-entitled matter.

18   Dated:  September 7, 2020

19              /s/ Dennis Ford

20              Official Court Reporter

21

22

23

24

25